# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

December 6, 2023

*Via ECF and Email*

The Honorable John P. Cronan,
   United States District Judge,
      Southern District of New York,
         500 Pearl Street,
           New York, NY 10007-1312,
               CronanNYSDChambers@nysd.uscourts.gov.

         Re:   *SVB Financial Group* v. *Federal Deposit Insurance Corporation*, No. 23 Civ. 7218 (JPC) (S.D.N.Y.)

Dear Judge Cronan,

      I write on behalf of SVB Financial Group, the debtor-plaintiff ("Debtor") in the above-captioned matter, in response to the Court's order inviting the submission of a supplemental letter addressing the significance to the pending motion to withdraw the reference of the FDIC-C's October 20, 2023 letter (the "Letter").[1]  (Dkt. No. 29.)

      The Letter restates the FDIC-C's position that it intends to withhold the Debtor's $1.93 billion in Account Funds notwithstanding the Secretary of the Treasury's invocation of the systemic risk exception, which the Secretary, together with the Chairs of the Federal Reserve and the FDIC itself, described publicly as ensuring that *all* depositors of SVB would have unfettered and immediate access to *all* of their deposits, without exception.  The Letter solidifies the basis for turnover under section 542(b) of the Bankruptcy Code, as the FDIC-C now formally confirms that it is refusing to restore to the Debtor the amount that was payable on demand, according to the Treasury Secretary when she invoked the systemic risk exception.  Moreover, the FDIC-C's attempt to dress up its ongoing refusal as the denial of an "administrative claim" is contradicted by the facts.  The FDIC-C had no administrative claims process for SVB depositors, and the Debtor did not file an administrative claim with the FDIC-C.  Nothing in the Letter alters the fact that the Debtor's claims pending in the Adversary Proceeding remain core bankruptcy claims seeking the turnover of estate property, and concomitant relief for violations of the automatic stay.

## I.   Background

      On March 12, 2023, the Treasury Secretary invoked the systemic risk exception to guarantee immediate access of *all* SVB depositors to *all* of their deposits.  Pursuant to the Treasury Secretary's action, the FDIC-C was required to fund all deposits as needed from the Deposit

---

[1]  Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Debtor's opposition to the pending motion to withdraw the reference (Dkt. No. 14).

The Honorable John P. Cronan
-2-

Insurance Fund, with the cost to be recouped from special assessments on the financial institutions who are responsible for funding the Deposit Insurance Fund.

Beginning Monday, March 13, 2023 through midday on Thursday, March 16, 2023, the Debtor had full access to its accounts and deposits, which, pursuant to the terms of the Treasury Secretary's invocation of the systemic risk exception, had been transferred to Silicon Valley Bridge Bank, a bank newly-created by action of the FDIC. (Ch. 11 Dkt. No. 655 at 3.) However, on March 16, 2023, after withdrawing approximately $200 million to pay various obligations, the Debtor's access to its own accounts at Bridge Bank was cut off by the FDIC. (*Id.*) The FDIC still refuses to tell the Debtor who directed this action, the basis for their authority, whether the FDIC-C acted alone or in tandem with the FDIC-R1 and/or FDIC-R2, or why the Debtor was treated differently than every other SVB depositor. Until the FDIC's abrupt about-face on August 11, 2023, in filing their motions to dismiss the underlying Adversary Proceeding, the federal government consistently stated—to the American public, Congress, and the Bankruptcy Court—over a dozen times that the Treasury Secretary's invocation required the FDIC to protect fully all depositors, without exception. (*See* Adv. Dkt. No. 55 at 9–15.)

On the morning of Friday, March 17, 2023 (the "Petition Date"), the Debtor commenced its chapter 11 proceeding by filing a voluntary petition with the Bankruptcy Court. After the Petition Date, the Debtor made demands of both the FDIC-R1 and FDIC-C for reinstatement of the funds in the Debtor's accounts. (Ch. 11 Dkt. No. 655 at 4.) On March 18, 2023, the Debtor sent the FDIC-R1 and Bridge Bank (which had not yet been placed into receivership) a letter demanding that they "reverse the seizure of [the Account Funds], honor the withdrawal and transfer requests listed . . . , [and] honor all future properly authorized instructions with respect to [the Debtor's] assets currently held at the Bridge Bank," which "are protected by the automatic stay as set forth in 11 U.S.C. § 362." (*Id.*, Ex. B.)

The FDIC-R1 and FDIC-C refused the Debtor to access any of the $1.93 billion previously held on deposit in its accounts. On June 26, 2023, the Debtor sent the FDIC-C a letter, "demand[ing] that FDIC-C provide [the Debtor] with access to the full amount of its uninsured deposits," just as the FDIC-C did for "every other former depositor of SVB" pursuant to the Treasury Secretary's invocation of the systemic risk exception. (*Id.*, Ex. C.) The FDIC-C did not respond to, or even acknowledge receipt of, the letter until months later. (*Id.* at 4.)

On July 9, 2023, the Debtor commenced this Adversary Proceeding, seeking turnover of the Account Funds and relief for violations of the automatic stay. On July 10, 2023, the Debtor filed protective proofs of claim with the FDIC-R1 and FDIC-R2. (*Id.*) No response has yet been received from either FDIC-R1 or FDIC-R2, notwithstanding that, on information and belief, the Debtor is the only SVB depositor to have been required to file such a proof of claim with either the FDIC-R1 or the FDIC-R2. (*Id.*)

On August 11, 2023, the FDIC-R1 filed the pending motion to withdraw the reference. The FDIC-C and FDIC-R2 joined this motion. On September 14, 2023, during a hearing before the Bankruptcy Court, Judge Glenn asked counsel for the FDIC-C whether the FDIC-C had "file[d] a notice or serve[d] a notice on [the Debtor] that [it had] properly triggered

The Honorable John P. Cronan

-3-

the claims process and these are the steps . . . going to go ahead, was that done?  Yes, or no?" (Sept. 14, 2023 Hr'g Tr. at 17:24–18:2.)  Counsel for the FDIC-C responded:  "I'm not aware that that has been done." (*Id*. at 18:3.)  On September 19, 2023, the FDIC-C sent a letter to the Debtor that purported to construe the Debtor's June 26 demand for restoration of the Debtor's deposit account as an "administrative claim," and said it would "determine" this "claim" within 30 days. (Adv. Dkt. No. 80, Ex. A at 1.)  The FDIC-C also conceded that it had no regulations governing this supposed "claims process" to address the Debtor's demand for its deposit monies.  (*Id.* at 2.)

On October 20, 2023, the Debtor received the Letter, refusing to restore to the Debtor any of the monies previously held in the Account Funds .  (Ch. 11 Dkt. No. 655, Ex. A.)

**II.     The Letter's Purported Denial of What the FDIC Calls the Debtor's "Administrative Claim" Does Not Impact the Court's Analysis of the Motion to Withdraw**

The Letter should have no bearing on the Court's consideration of the pending motion to withdraw the reference.  Although the FDIC-C now claims to construe the Debtor's June 26 demand letter "as a timely claim for insurance coverage . . . under 12 U.S.C. § 1821(f)" (Adv. Dkt. No. 80, Ex. A at 1), the FDIC-C's self-serving mischaracterization of events is of no moment.  The FDIC-C had no claims process or procedures applicable here because all depositors' funds were made immediately available at the Bridge Bank beginning on March 13, 2023; the June 26 demand letter is not a claim for insurance coverage under section 1821(f) because that is not the basis for the Debtor's entitlement to its Account Funds; and the Debtor is not demanding insurance coverage but rather return of, and access to, its deposit funds, pursuant to the terms of the Treasury Secretary's invocation of the systemic risk exception.  The FDIC's mischaracterization of the Debtor's claims should not impact the Court's analysis of the pending motion because the Complaint expressly alleges turnover and automatic-stay claims under the Bankruptcy Code.  (*See* Compl. ¶¶ 65–91.)  That FIRREA may offer the Debtor ***additional*** remedies beyond those set forth in the Bankruptcy Code (and that the FDIC-C purports to construe the Debtor's demand for its Account Funds as a timely FIRREA claim) does not somehow transform the Debtor's bankruptcy claims into administrative claims.  Courts have long distinguished bankruptcy claims from administrative claims and held that "where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required." *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1073–74 (3d Cir. 1992) (quoting *In re Town & Country Home Nursing Servs. Inc.*, 963 F.2d 1146, 1154 (9th Cir. 1991)).[2]

---

[2]  *See also In re THDL Liquidating LLC,* , 2020 WL 6818442, at *3 (Bankr. D. Del. July 7, 2020) (bankruptcy court had jurisdiction "to determine whether or not the Defendants' withholding of Medicare payments post-petition violated the automatic stay under 11 U.S.C. § 362"); *In re Cir. City Stores, Inc.*, 2016 WL 1714515, at *6 (Bankr. E.D. Va. Apr. 26, 2016) ("The California exhaustion of administrative remedies provision . . . does not require this Court to defer to the Director of the California Department of Industrial Relations in defining what constitutes the bankruptcy estate because the Trustee's claims do not solely arise under the California Labor Code.  Instead, the Trustee's claims [to recover excess letter of credit proceeds] primarily arise under federal bankruptcy law."); *In re Drexel Burnham Lambert Grp. Inc.*, 120 B.R. 724, 739 n.17 (Bankr. S.D.N.Y. 1990) ("Because the bankruptcy court has jurisdiction over property of the estate, the principle of exhaustion of administrative remedies is not

The Honorable John P. Cronan

-4-

In *In re University Medical Center*, the Department of Health and Human Services ("HHS") argued that that neither the bankruptcy court nor the district court had jurisdiction over a debtor's claims for violations of the automatic stay, stemming from the HHS's refusal to remit certain reimbursement payments. *See* 973 F.2d at 1072. Instead, the HHS contended that the debtor was required to exhaust its administrative remedies under the Medicare statute before seeking judicial review. *Id.* The Third Circuit disagreed and held that the debtor's "claim arises under the Bankruptcy Code and not under the Medicare statute." *Id.* at 1073. The Third Circuit specifically noted that there was no question as to the amount of reimbursement due for any cost reporting period, and the parties' dispute centered on whether the HHS violated the automatic stay provisions of the Bankruptcy Code. *Id.*

Likewise here, "the parties do not dispute the amount of [the Account Funds]," and the "[A]dversary [P]roceeding [is] based on the contention that [the FDIC] violated the automatic stay provision of the Bankruptcy Code." *Id.* Because "there is an independent basis for bankruptcy court jurisdiction," the Debtor's claims also "arise[] under the Bankruptcy Code and not under the [FIRREA] statute," *id.*, rendering "exhaustion of administrative remedies pursuant to other jurisdictional statutes" inapplicable, *id.* at 1073–74. To the extent the FDIC attaches any significance to the Debtor's protective proofs of claim filed with the FDIC-R1 and -R2, as the Court noted during oral argument, it was "prudent" for the Debtor to take protective actions under FIRREA—in addition to bringing its bankruptcy claims in this Adversary Proceeding—to prevent "possible forfeiture down the road." (Oct. 19, 2023 Hr'g Tr. 8:15–18.)[3] Similarly, the Debtor may commence a new action to appeal the FDIC-C's supposed denial of an administrative claim, as a precaution to prevent potential forfeiture. Any relief sought in connection with such a protective action does not change the fact that there is an independent basis for bankruptcy jurisdiction here.

### III.  The Letter Does Not Impact the Debtor's Ongoing Bankruptcy Claims

The Debtor's claims in the Adversary Proceeding are core bankruptcy claims seeking turnover of property of the estate and concomitant relief for violations of the automatic stay. The Letter has no impact on the Debtor's claims. Since the Petition Date, the FDIC has

---

applicable."); *In re Rusnak*, 184 B.R. 459, 463 (Bankr. E.D. Pa. 1995) ("[T]he Bankruptcy Code provides an independent basis for jurisdiction" in an adversary proceeding alleging violations of the automatic stay).

[3] The FDIC parties argue in the motions to dismiss and motion to withdraw the reference that the Debtor's bankruptcy claims must be resolved in the FDIC's so-called claims process. (*See, e.g.*, Adv. Dkt. No. 25 at 10–16; Dkt. No. 1, Ex. A at 10.) But before denying the Debtor's "administrative claim," the FDIC-C admitted that it had no claims process. It has not promulgated any regulations or procedures governing its so-called claims process, it provided no notice of such a claims process, and it made clear that it had no intention of reviewing any information in support of the Debtor's "claim" or in assessing any evidence or argument from the Debtor in reaching its determination. (Adv. Dkt. No. 80, Ex. A at 1.) In response to the Debtor's Initial Requests for Production of Documents in the Adversary Proceeding, the FDIC-C did not produce any evidence of even the existence of the claims process, much less of its parameters. (Adv. Dkt. No. 88.) Without any semblance of due process, the FDIC-C denied $1.93 billion of what it styled the Debtor's "administrative claims" for funds indisputably held in the Debtor's deposit accounts prior to March 17, 2023. The Letter further proves that the FDIC's supposed claims process is a sham, and the Debtor's bankruptcy claims should remain in the Bankruptcy Court under settled principles of law and equity.

The Honorable John P. Cronan

-5-

repeatedly refused to release the $1.93 billion in Account Funds to the Debtor and improperly reversed intercompany receivables owed to the Debtor by SVB in violation of the automatic stay. (*See, e.g.*, Compl. ¶¶ 40–52; Ch. 11 Dkt. No. 655 at 2–4.) Before it was prompted to do so by the Bankruptcy Court, the FDIC-C declined even to respond to, or acknowledge receipt of, the Debtor's June 26 letter demanding the release of the Account Funds.

The Letter is a continuation of the FDIC's ongoing violation of the Bankruptcy Code, and the Letter disputes neither the amount nor ownership of the Account Funds. (*See, e.g.*, Letter at 3 ("As of March 16, 2023, FDIC-R1 had a deposit liability to SVBFG of more than $1.929 billion.")) Thus, the key issues for the Bankruptcy Court to resolve remain the same: whether the Account Funds are an asset of the bankruptcy estate, whether the FDIC must turn over those funds, and whether the FDIC violated the automatic stay in failing to do so under sections 542 and 362 of the Bankruptcy Code. These are quintessential, core bankruptcy issues that should be left for the Bankruptcy Court to resolve.[4]

Respectfully submitted,

*/s/ Robert A. Sacks*

Robert A. Sacks

cc:   All Counsel

---

[4] *See, e.g.*, *In re BankUnited Fin. Corp.*, 727 F.3d 1100, 1104 n.5 (11th Cir. 2013) ("Section 1821(d)(13)(D) applies only to assets of the FDIC's receivership. It therefore does not preclude the Bankruptcy Court from determining the threshold question of whether the tax refunds are an asset of the bankruptcy estate."); *In re Lehman Bros. Holdings Inc.*, 2013 WL 12334707, at *5 (S.D.N.Y. Aug. 8, 2013) (denying defendant's motion to withdraw reference under § 157(d) in an action seeking declaratory judgment that defendant violated the automatic stay); *In re Temecula Valley Bancorp, Inc.*, 523 B.R. 210, 216, 219 (C.D. Cal. 2014) ("[T]he clear weight of authority" was that "§ 1821(d)(13)(D) does not mandate withdrawal of the reference" in a dispute with the FDIC-R regarding "certain tax refunds are property of the bankruptcy estate"); *In re First City Asset Servicing Co.*, 158 B.R. 78, 79–82 (Bankr. N.D. Tex. 1993) (concluding that the bankruptcy court had jurisdiction to consider whether the FDIC-R violated the automatic stay); *In re Purcell*, 141 B.R. 480, 481–86 (Bankr. D. Vt. 1992), *aff'd*, 150 B.R. 111 (D. Vt. 1993) (rejecting a claim that FIRREA divested bankruptcy court of jurisdiction to determine "the nature, validity, and extent" of the FDIC's lien on the debtor's property).