UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                 :

In re:                            :

                                 :           Bankruptcy Case

      SVB FINANCIAL GROUP,         :      No. 23-10367 (MG)

                                 :

             Debtor,           :

                                 :
------------------------------------------------------------------------X
                                 :

SVB FINANCIAL GROUP,         :

                                 :

             Plaintiff,       :

                                 :

         -v-               :       23 Civ. 7218 (JPC)

                                 :    Adv. Proc. No. 23-1137 (MG)

FEDERAL DEPOSIT INSURANCE CORPORATION, in  :

its Corporate Capacity, and FEDERAL DEPOSIT  :

INSURANCE CORPORATION, as Receiver for Silicon  :     OPINION AND

Valley Bank and Silicon Valley Bridge Bank, N.A.,  :     ORDER

                                 :

            Defendants.      :

                                 :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        On March 10, 2023, Silicon Valley Bank, Santa Clara ("SVB") failed after experiencing a

run on deposits and was placed into receivership administered by the Federal Deposit Insurance

Corporation (the "FDIC").  Two days later, the Secretary of Treasury invoked a statutory provision

known as the Systemic Risk Exception, which, among other things, exempts the FDIC from the

requirement that it resolve a failed bank in the least costly manner.  This marked the first time that

the Systemic Risk Exception has been invoked in connection with the resolution of a failed bank

placed in FDIC receivership.  Following invocation of the Exception, both the Secretary of

Treasury and the FDIC made statements that, according to SVB Financial Group ("SVB Group"),

the parent company of SVB, assured that all SVB Group's deposits, whether insured or uninsured,

would be protected.

On March 17, 2023, SVB Group filed for bankruptcy under Chapter 11 of the Bankruptcy Code. *See In re SVB Fin. Grp.*, No. 23-10367 (Bankr. S.D.N.Y.) ("SVB Group Bankruptcy"), Dkt. 1. Before SVB was placed into receivership, SVB Group had over $2.1 billion in deposit accounts at SVB. Those funds, along with other insured and uninsured deposits at SVB, were transferred to a bridge bank that was established shortly after the Systemic Risk Exception was invoked. Following SVB Group's withdrawal of some of the funds, it had $1,933,805,708 (the "Deposit Account Total") in deposit accounts at the bridge bank on March 16, 2023, on which date it lost access to the funds. Considering those funds to be the most significant assets of the bankruptcy estate, SVB Group initiated an adversary proceeding in bankruptcy court, seeking, among other relief, turnover of the Deposit Account Total. *See SVB Fin. Grp. v. Fed. Deposit Ins. Corp.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.) ("Adversary Proceeding"), Dkt. 1 ("Complaint"). SVB Group brings claims in the Adversary Proceeding against the FDIC in its corporate capacity as insurer of qualifying bank deposits ("FDIC-C"), in its capacity as receiver for SVB ("FDIC-R1"), and in its capacity as receiver for a bridge bank that was stood up after SVB failed ("FDIC-R2," collectively with FDIC-C and FDIC-R1, "Defendants"). *Id.* ¶¶ 1, 27. Defendants have moved in the Adversary Proceeding to dismiss the Complaint, arguing, *inter alia*, that the bankruptcy court lacks subject matter jurisdiction on account of SVB Group's failure to exhaust the administrative claims process under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, and further that SVB Group fails to state a claim even were jurisdiction to exist. *See* Adversary Proceeding, Dkts. 25 ("FDIC-C Motion to Dismiss"), 28 ("FDIC-R1 Motion to Dismiss"), 32 ("FDIC-R2 Motion to Dismiss").

FDIC-R1, joined by FDIC-R2 and FDIC-C, now moves for withdrawal of the Adversary Proceeding's reference to bankruptcy court. Dkt. 1-1 ("Motion"); Dkt. 3 ("FDIC-R2 Joinder"); Dkt. 4 ("FDIC-C Joinder"). Defendants assert that withdrawal of the reference is mandatory under 28 U.S.C. § 157(d) and alternatively should be ordered pursuant to that statute's permissive withdrawal clause. SVB Group opposes withdrawal and is joined by the Unofficial Committee of Unsecured Creditors of SVB Group (the "Committee"), an intervenor in the Adversary Proceeding. Dkts. 14 ("Opposition"), 15. This Court held oral argument on the motion to withdraw the reference on October 19, 2023. *See* Dkt. 27 ("Tr."). For the reasons that follow, the Court concludes that the issues implicated in the Adversary Proceeding require a court to address novel and substantial questions of federal law, which exist outside of the Bankruptcy Code, making withdrawal of the reference mandatory.

## I.  Factual Background[1]

In the twenty-three years leading up to the events of this past March, SVB Group "owned SVB and a number of other affiliated SVB businesses." Complaint ¶ 28; Opposition at 5. "During this period, [SVB Group] deposited substantially all of its funds with its subsidiary bank, SVB." Opposition at 5. As of March 10, 2023, SVB Group had approximately $2,115,958,220 in three

---

[1] This factual background, which is assumed to be true in resolving this motion, is taken from the allegations in the Complaint in the Adversary Proceeding, the parties' filings on this docket, and other filings in the Adversary Proceeding and the related Chapter 11 proceeding to which the parties have referred in their submissions or at oral argument. *See Roman Cath. Diocese of Rockville Ctr., N.Y. v. Arrowood Indem. Co.*, No. 20 Civ. 11011 (VEC), 2021 WL 1978560, at *1 n.1 (S.D.N.Y. May 17, 2021) (assuming facts "drawn from the parties' filings" to be true in deciding a motion to withdraw the reference); *Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC v. Greiff*, 617 B.R. 198, 200 (S.D.N.Y. 2020) (drawing facts, on a motion to withdraw reference of an adversary proceeding from bankruptcy court, "from the parties' submissions in support of and in opposition to the motion, including memoranda of law and exhibits"). No facts material to resolving the motion to withdraw appear to be in dispute. *See* Tr. at 13:19-24 (confirmation from FDIC-R1's counsel that there are no material facts in dispute), 26:7-12 (similar confirmation from SVB Group's counsel).

different deposit accounts at SVB.  Complaint ¶¶ 29, 33; Opposition at 7.  That day, SVB failed when it was unable to cover withdrawals in connection with a run on deposits, prompting the California Department of Financial Protection and Innovation to close the bank and appoint the FDIC as its receiver—as noted above, that is FDIC-R1.  Motion at 1, 3; Opposition at 5; *see* Complaint ¶ 30.  As receiver for SVB, FDIC-R1 "succeed[ed] to . . . all rights, titles, powers, and privileges of" SVB, 12 U.S.C. § 1821(d)(2)(A)(i), and became responsible for administering and paying valid claims in accordance with various provisions of FIRREA, *id.* § 1821(d)(3)-(13).  Also on March 10, 2023, the FDIC formed the Deposit Insurance National Bank of Santa Clara ("DINB").  Complaint ¶ 31; Opposition at 5; FDIC-R2 Joinder ¶ 1.  All insured deposits of SVB— *i.e.*, amounts up to the FDIC's standard $250,000 insurance limit, *see* 12 U.S.C. § 1821(a)(1)(E)— were immediately transferred to DINB.  Complaint ¶ 31; Opposition at 5.

Two days later, on March 12, 2023, Janet Yellen, the Secretary of Treasury, after consultation with the President of the United States, authorized application of the Systemic Risk Exception codified at 12 U.S.C. § 1823(c)(4)(G).  Complaint ¶¶ 3, 35; Motion at 4; Opposition at 6 (citing Complaint ¶ 35); *Joint Statement by the Dep't of Treas., Fed. Res., & FDIC* (Mar. 12, 2023), available at https://www.fdic.gov/news/press-releases/2023/pr23017.html.  The same day, the FDIC applied to the Office of the Comptroller of the Currency (the "OCC") to charter a bridge bank, Silicon Valley Bridge Bank, N.A. (the "Bridge Bank").[2]  Complaint ¶ 32; FDIC-R2 Joinder ¶ 1; Opposition at 6 (citing Complaint ¶ 32).  The OCC approved the bridge bank application on March 13, 2023.  FDIC-R2 Joinder ¶ 1.  SVB Group asserts that all deposits—both insured and

---

[2] "A bridge bank 'hold[s] assets and liabilities of' a bank under FDIC receivership and 'continues the operation of the other Institution's business pending its acquisition or liquidation.'" *Rise Dev. Partners, LLC v. Signature Bank*, No. 23 Civ. 4242 (JGK), 2023 WL 4364864, at *1 n.1 (S.D.N.Y. July 6, 2023) (citing 26 C.F.R. § 1.597-1).

uninsured—were then transferred to the Bridge Bank.  Complaint ¶¶ 32, 37; Opposition at 6-7. This included SVB Group's deposits in the three deposit accounts mentioned above.  Complaint ¶ 39; Opposition at 6-7; FDIC-R2 Joinder ¶ 2.

The same day the Bridge Bank was approved, FDIC-C issued a press release, which stated that "[t]he [FDIC] today transferred all deposits—both insured and uninsured—and substantially all assets of [SVB]" to the Bridge Bank.  *FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California* (Mar. 13, 2023), available at https://www.fdic.gov/news/press-releases/2023/pr23019.html ("March 13, 2023 Press Release"); *see* Complaint ¶¶ 4, 37.  The press release announced that "[d]epositors will have full access to their money this morning, when [the Bridge Bank] opens and resumes normal banking hours and activities," and that the "transfer of all the deposits was completed under the systemic risk exception approved yesterday."  March 13, 2023 Press Release; *see* Complaint ¶¶ 4, 37.  Of particular significance to SVB's claims in the Adversary Proceeding, the March 13, 2023 Press Release further stated that the transfer of deposits to the Bridge Bank was "an action designed to protect all depositors of Silicon Valley Bank," that "[a]ll depositors of the institution will be made whole," and that "[s]hareholders and certain unsecured debt holders will not be protected."  March 13, 2023 Press Release; *see* Complaint ¶¶ 4, 37.

In addition to the March 13, 2023 Press Release, the FDIC and the Secretary of Treasury reiterated in a number of public statements that all depositors of SVB would have their deposits protected by the FDIC.  Complaint ¶ 38; Opposition at 7.  Such statements include the Secretary's testimony before congressional committees on two separate occasions in March 2023, remarks by FDIC-C Chairman Martin J. Gruenberg to a congressional committee in May 2023, and a statement by Acting Comptroller of the Currency and Director of the FDIC Michael Hsu at a May

11, 2023 FDIC Board meeting.  Complaint ¶¶ 6, 38;[3] *see also id.* ¶¶ 40 (alleging that, when it opened on March 13, 2023, the Bridge Bank "announced that depositors had 'full access to their money,' and that all existing and new deposits were protected by the FDIC," and further citing the FAQ page on FDIC's website that allegedly stated that "[n]o one lost any money on deposit as a result of the closure of" SVB), 51 (citing a Notice of Proposed Rulemaking issued by FDIC-C, in which FDIC-C allegedly "again represented that the [Deposit Account Total]—both insured and uninsured portions—[was] protected, as were all other depositors of SVB").

Initially, the Bridge Bank allowed SVB Group, like other SVB customers, to access its accounts.  *Id.* ¶ 42; Opposition at 7.  On March 15 and 16, 2023, SVB Group successfully initiated eight wire transfers from its accounts at the Bridge Bank.  Complaint ¶ 42; Opposition at 7; *see* Tr. at 24:10-12 (SVB Group's attorney explaining at oral argument that SVB Group withdrew approximately "$180 million to pay various debts that [it] had").  Concurrently, on March 15, FDIC-R1 sent a letter to the Bridge Bank, purporting to exercise a contractual right to re-assert control of SVB Group's accounts.  Adversary Proceeding, Dkt. 33 ("Fritz Decl.") ¶ 6, Exh. D.  The letter stated that FDIC-R1 had elected to "call the all [sic] deposit accounts of SVB Financial Group and all associated assets and liabilities, including but not limited to . . . [certain listed] accounts," which included SVB Group's three deposit accounts mentioned above.  *Id.*; *see* Complaint ¶ 44; FDIC-R2 Joinder ¶ 3.  As a result, "FDIC-R1 retained the deposit account liability

---

[3] *See Testimony of Sec'y of the Treasury Janet L. Yellen Before the Comm. on Fin., U.S. Senate* (Mar. 16, 2023), available at https://home.treasury.gov/news/press-releases/jy1348; *Testimony of Sec'y of the Treasury Janet L. Yellen Before the Comm. on Fin. Servs. & Gen. Gov't Appropriations, U.S. House* (Mar. 23, 2023), available at https://home.treasury.gov/news/press-releases/jy1361; *Statement by Michael J. Hsu, Acting Comptroller of the Currency at the FDIC Bd. Meeting* (May 11, 2023), available at https://occ.treas.gov/news-issuances/news-releases/2023/nr-occ-2023-43a.pdf; *Remarks by Chairman Martin J. Gruenberg on "Oversight of Prudential Regulators" before the Comm. on Fin. Servs., U.S. House* (May 16, 2023), available at https://www.fdic.gov/news/speeches/2023/spmay1523.html.

for the SVB Financial Group deposit accounts." FDIC-R2 Joinder ¶ 3; *see also* Complaint ¶ 44. And by the evening of March 16, the Bridge Bank began to reject wire transfers initiated by SVB Group. Complaint ¶ 43; Opposition at 8. SVB Group contends that this was because FDIC-R1 had "instructed [the] Bridge Bank to place a hold on" SVB Group's accounts at the Bridge Bank. Complaint ¶ 43; *accord* Opposition at 8; *see also* Complaint ¶ 43 (alleging that FDIC-R1 directed "one or more Bridge Bank employees to contact the recipient banks for certain of the wires that had already cleared, and incorrectly inform them that the wires had been initiated in error and should be canceled").

As of March 16, when SVB Group lost access to the three deposit accounts—which by that time were held by FDIC-R1—it had the following amounts in those accounts:

| Description | Account No. (last 4 digits) | Balance |
|---|---|---|
| Operating Account | *5720 | $1,771,057,098 |
| Regulation W Account | *0822 | $143,583,718 |
| SVB Capital Operating Account | *6176 | $19,154,892 |

Complaint ¶ 45; Opposition at 8. The combined balance of these accounts was $1,933,805,708— *i.e.*, the Deposit Account Total. Complaint ¶ 45.[4] The next day, SVB Group filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. SVB Group Bankruptcy, Dkt. 1; *see* Complaint ¶ 46. No Defendant filed a proof of claim in the SVB Bankruptcy by the bar date of September 14, 2023. *See* Tr. at 14:7-12, 15:1-2; Motion at 1; FDIC-R2 Joinder ¶ 13; *see generally* SVB Group Bankruptcy (reflecting no FDIC-C proof of claim

---

[4] As alleged, the total amount "includes approximately $6,222,681.93 in intercompany receivables" that SVB Group alleges were "owed to [SVB Group] by [SVB]" and "were improperly reversed or unwound on March 17, 2023." Complaint ¶ 1 n.1.

having been filed).[5]

On March 27, 2023, the Bridge Bank was dissolved, and the FDIC was appointed as receiver for the dissolved entity; as noted, this receivership is FDIC-R2.  FDIC-R2 Joinder ¶¶ 5-7.  Also on that day, FDIC-R2 and FDIC-C entered into a purchase and assumption agreement with First Citizens Bank & Trust Company in Raleigh, North Carolina.  Fritz Decl. ¶ 11.

Defendants have refused to pay SVB Group the Deposit Account Total.  Complaint ¶¶ 48-49.  Instead, the FDIC entities have insisted that any recovery by SVB Group must be determined, in the first instance, through FIRREA's administrative procedures.  *Id.* ¶¶ 52, 57.

## II.  Procedural History

On July 9, 2023, SVB Financial Group commenced the Adversary Proceeding by filing the Complaint in bankruptcy court against FDIC-R1, FDIC-C, and FDIC-R2, asserting four Counts.  *See id.* ¶¶ 65-91.  Count I seeks turnover of the Deposit Account Total from FDIC-C under Section 542 of the Bankruptcy Code on the grounds that FDIC-C guaranteed payment of such funds through the invocation of the Systemic Risk Exception.  *Id.* ¶¶ 65-73.  Count II asserts, in the alternative to Count I, a claim against FDIC-R1 and FDIC-R2 for turnover of the Deposit Account Total under Section 542.  *Id.* ¶¶ 74-79.  Count III alleges that Defendants violated the automatic bankruptcy stay under 11 U.S.C. § 362(a) by transferring SVB Group's funds and refusing to release the Deposit Account Total.  *Id.* ¶¶ 80-83.  Count IV seeks a declaration that "(i) the FDIC-R[6] has no claim or right that would permit the unilateral exercise of a 'setoff' against the Account Funds and, (ii) the FDIC-C has no claim or right that would permit the unilateral exercise

---

[5] As FDIC-R1's counsel explained at oral argument, "[t]he FDIC, as receiver, is relying on a defensive right [of] setoff," whose assertion FDIC-R1 maintains "does not invoke the bankruptcy court's equitable claims allowance process."  Tr. at 14:12-16.

[6] As used in the Complaint, "FDIC-R" refers to both FDIC-R1 and FDIC-R2.  *See* Complaint ¶ 1.

of a 'setoff' against the Account Funds." *Id.* ¶ 90.  In the alterative, Count IV requests that if "the

FDIC-C or the FDIC-R has a valid right of setoff," that "the Court declare that any right of setoff

against the Account Funds is limited to amounts for which there is mutuality of obligation between

the Debtor and each of the FDIC-R or the FDIC-C, respectively," *id.*, and further that if the Court

finds that either FDIC-R1 or FDIC-R2 has a valid claim or claims that would justify the exercise

of a setoff right, "that the Court (i) determine the amount of any such setoff, and (ii) declare that

either the FDIC-C or FDIC-R immediately turn over any excess funds to [SVB Group]," *id.* ¶ 91.

On July 31, 2023, the bankruptcy court authorized three parties to intervene in the Adversary

Proceeding as intervenor plaintiffs: the Ad Hoc Cross-Holder Group, the Ad Hoc Group of Senior

Noteholders, and the Committee.  Adversary Proceeding, Dkts. 21-23.[7]

        On July 10, 2023, the "Claims Bar Date" set by FDIC-R1 and FDIC-R2, Complaint, Exh.

A at 1; FDIC-R1 Motion to Dismiss, Exh. A at 4; *see also* 12 U.S.C. § 1821(d)(3)(B)-(C), SVB

Group submitted three proofs of claim to FDIC-R1 pursuant to the FIRREA administrative claims

process under 12 U.S.C. § 1821(d).  Motion at 2; *see also* FDIC-R1 Motion to Dismiss, Exh. A

(three claims submitted against FDIC-R1).  The first claim is for "$1.9 billion [in] unremitted

deposit account funds," the second is for "a contingent and unliquidated amount on account of

alleged actions or omissions of FDIC-R1 (such as allegedly selling the assets of SVB for less than

their value)," and the third is for "an unidentified amount [of] deferred compensation plan

participants."  Motion at 6; *see also* FDIC-R1 Motion to Dismiss, Exh. A at 2-3, 18, 33.  SVB

---

        [7] The Ad Hoc Cross-Holder Group "holds almost 50% of [SVB Group]'s preferred stock . . . and over 39% of the aggregate principal amount of [SVB Group]'s senior notes." Adversary Proceeding, Dkt. 6 ¶ 14.  The Ad Hoc Group of Senior Noteholders "represents holders (or investment advisors or managers acting on behalf of holders) of material portions of both [SVB Group]'s senior notes and [SVB Group]'s preferred stock."  Adversary Proceeding, Dkt. 7 ¶ 2.  On March 28, 2023, the United States Trustee appointed five unsecured creditors to serve on the Committee pursuant to Section 1102 of the Bankruptcy Code.  SVB Group Bankruptcy, Dkt. 72.

Group "filed identical proofs of claims against FDIC-R2."[8]  Motion at 6 n.3; *see* FDIC-C Motion

to Dismiss, Exh. A at 17 (proof of claim against FDIC-R2 for $1.933 billion).

SVB Group's claims were accompanied by addenda.  FDIC-R1 Motion to Dismiss, Exh.

A; FDIC-C Motion to Dismiss, Exh. A.  In the two claims—one against FDIC-R1 and the other

against FDIC-R2—related to the $1.933 billion that is the subject of the Adversary Proceeding,

*i.e.*, the Deposit Account Total, SVB Group reserved that it was filing the claims

> without prejudice to its positions that (i) the United States Bankruptcy Court for the
> Southern District of New York . . . presiding over [SVB Group]'s chapter 11
> case . . . has exclusive jurisdiction to determine the matters that are the subject of
> this Proof of Claim (and accordingly the FDIC-R does not have jurisdiction), (ii)
> the matters to which this Proof of Claim relates involve [FDIC-C], as each of Title
> 12 of the United States Code, the FDIC-C's actions, and the FDIC-R's own
> instructions make clear, and, therefore, (iii) no proof of claim is required for [SVB
> Group] to be paid the approximately $1.93 billion it had on deposit at SVB and then
> the Bridge Bank given, among other things, the FDIC's March 12, 2023 invocation
> of Title 12's "systemic risk exception" pursuant to 12 U.S.C. § 1823(c)(4)(G) and
> concurrent pronouncement that "**all**" depositors of SVB are entitled to access to
> their deposit funds in full, and "**all**" would be made whole the by FDIC-C and (iv)
> the automatic stay under section 362 of the Bankruptcy Code applies and any action
> by the FDIC-C or the FDIC-R to continue to exercise control over [SVB Group]'s
> assets will continue to violate that stay.

FDIC-R1 Motion to Dismiss, Exh. A at 2 (proof of claim against FDIC-R1), 3; FDIC-C Motion to

Dismiss, Exh. A at 17 (proof of claim against FDIC-R2), 18.

On August 11, 2023, FDIC-C, FDIC-R1, and FDIC-R2 each moved in the Adversary

Proceeding to dismiss the Complaint, arguing that the bankruptcy court lacks subject matter

---

[8] SVB Group does not appear to dispute that it filed proofs of claim against both FDIC-R1
and FDIC-R2.  *See* Opposition at 11 n. 7 ("In their motions, the FDIC entities make much of the
fact that on July 10, 2023, the FDIC-R1 and FDIC-R2's filing deadlines, [SVB Group] filed
administrative proof of claims seeking to recover the same funds at issue in the adversary
proceeding.  But as [SVB Group] expressly stated in both the previously filed adversary complaint
and in each of those proofs of claims, those claims were asserted on a protective basis without
prejudice to [SVB Group]'s claims in the Bankruptcy Court or to the Bankruptcy Court's exclusive
jurisdiction over these matters." (citations omitted)).

jurisdiction because SVB Group failed to exhaust FIRREA's administrative claims process; that even upon exhaustion, this action may only be filed in the Northern District of California or the District Court for the District of Columbia; that 12 U.S.C. § 1821(j) bars SVB Group's requested relief; and that, even were there to be jurisdiction, SVB Group fails to state a claim upon which relief may be granted.  Adversary Proceeding, Dkts. 25-29, 31-33.  On August 30, 2023, SVB Group opposed the motions, *id.*, Dkts. 51-52, and on September 6, 2023, Defendants filed replies, *id.*, Dkts. 70-71, 74.  In addition, on August 15, 2023, SVB Group moved for an injunction compelling FDIC-C to pay the Deposit Account Total "into an interest-bearing escrow account under the [bankruptcy court]'s control pending adjudication of entitlement to those funds." *Id.*, Dkt. 41 at 1-2; *accord id.*, Dkts. 40, 42.[9]  On August 29, 2023, FDIC-C opposed the motion for an injunction, *id.*, Dkt. 50, and on September 5, 2023, SVB Group replied, *id.*, Dkts. 61-62.  The motions to dismiss and the motion for an injunction are pending.

FDIC-R1 filed the instant motion to withdraw the reference from bankruptcy court on August 15, 2023, Dkt. 1, and that same day, FDIC-R2 and FDIC-C filed joinders to FDIC-R1's motion, Dkts. 3, 4.  On August 25, 2023, SVB Group opposed the motion to withdraw, Dkt. 14, and the Committee filed a joinder to that opposition, Dkt. 15.  On September 1, 2023, FDIC-R1 filed a reply.  Dkt. 17 ("Reply").  On October 13, 2023, the Court granted the three requests for joinder.  Dkt. 21.[10]  On October 19, 2023, the Court held oral argument on the motion to withdraw the reference.  *See* Dkt. 27.

---

[9] The three intervenor plaintiffs in the Adversary Proceeding—the Ad Hoc Cross-Holder Group to SVB Group, the Ad Hoc Group of Senior Noteholders, and the Committee—also filed papers opposing the motions to dismiss, Adversary Proceeding, Dkts. 55-57, and filed joinders to SVB's motion for an injunction, *id.*, Dkts. 63-65.

[10] The other intervenor plaintiffs in the Adversary Proceeding—the Ad Hoc Group of Cross Holders and the Ad Hoc Group of Senior Noteholders—have not joined in SVB Group's opposition to withdrawal of the reference.

### III. Discussion

District courts have original jurisdiction over civil proceedings "arising under," "arising in," or "related to" cases under Title 11, the United States Bankruptcy Code.  28 U.S.C. § 1334(b). But "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."  28 U.S.C. § 157(a).  In this District, Title 11 cases are automatically referred to the bankruptcy court pursuant to a standing order.  *In re Standing Order of Reference Re: Title 11*, 12 Misc. 32 (LAP) (S.D.N.Y. Feb. 1, 2012); *see In re Lyondell Chem. Co.*, 467 B.R. 712, 718 (S.D.N.Y. 2012).

A district judge may withdraw a case's reference to the bankruptcy court either because withdrawal is required or because it is permissive.  Defendants argue that withdrawal of the reference for the Adversary Proceeding is mandatory under 28 U.S.C. § 157(d) and, if not required, appropriate as a matter of permissive withdrawal.  Because the Court agrees with Defendants that withdrawal is mandatory, it does not reach the question of permissive withdrawal.

### A. Mandatory Withdrawal Standard

Section 157(d) requires withdrawal of a reference to bankruptcy court if "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d).[11]  The Second Circuit has explained that withdrawal is mandatory if "substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for resolution of the proceeding."  *In re*

---

[11] While not relevant here given the Court's conclusion that withdrawal is mandatory, Section 157(d) also provides that a "district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d).

*Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990).  Such consideration exists for "cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes."  *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *accord Enron Power Mktg. v. Cal. Power Exch. (In re Enron Corp.)*, No. 04 Civ. 8177 (RCC), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) ("The purpose of § 157(d) is to assure that an Article III judge decides issues calling for more than routine application of federal laws outside the Bankruptcy Code." (quotations and alterations omitted)).  While novel issues of federal law are not necessary to satisfy this standard, the presence of such issues suggests that withdrawal is mandatory.  *See Sec. Inv. Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 486 B.R. 579, 582 (S.D.N.Y. 2013); *Sec. Inv. Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011); *Bear, Stearns Sec. Corp. v. Gredd*, No. 01 Civ. 4379 (NRB), 2001 WL 840187, at *2 (S.D.N.Y. July 25, 2001); *In re Ionosphere Clubs, Inc.*, 103 B.R. 416, 419 (S.D.N.Y. 1989).  As discussed *infra* III.C, FIRREA's administrative exhaustion and jurisdictional provisions and the Systemic Risk Exception are most relevant to the mandatory withdrawal analysis here.

### B.  Overview of the FDIC's Roles, the Relevant Provisions of FIRREA, and the Systemic Risk Exception

The Court begins with an overview of the two roles that the FDIC has played following SVB's failure.  As discussed, the FDIC appears in this case in its corporate capacity and as receiver for two separate banks.  *See supra* II.  In the former role, FDIC-C operates pursuant to congressional authority to administer the Deposit Insurance Fund—thereby acting as an insurer for covered deposits at the failed institution.  *See* 12 U.S.C. § 1821(a)(4).  In the latter role as receiver, FDIC-R1 and FDIC-R2 manage the failed bank and the created bridge bank, respectively.  *See id.* § 1821(d)(2) (specifying the powers of the FDIC as receiver of a failed bank).  In this role,

the FDIC is responsible for liquidation or winding up the affairs of an insured depository institution upon its failure.  *Id.* § 1821(c)(2)(A)(ii).  FIRREA establishes a framework for claims submitted for payment from the FDIC in each role.

First, 12 U.S.C. § 1821(f) concerns claims seeking payment from the FDIC-C of insured deposits.  The statute provides that, in the event "of the liquidation of, or other closing or winding up of the affairs of, any insured depository institution, payment of the insured deposits in such institution shall be made by the [FDIC] as soon as possible," 12 U.S.C. § 1821(f)(1), and further that the FDIC, "in its discretion, may require proof of claims to be filed and may approve or reject such claims for insured deposits," *id.* § 1821(f)(2).  The statute also allows for judicial review, in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, of determinations regarding any such claims: "[a] final determination made by the [FDIC] regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with chapter 7 of title 5 by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located."  *Id.* § 1821(f)(4).  Judicial review under this provision must be sought within sixty days of a final determination by the FDIC. *Id.* § 1821(f)(5).

Second, Congress also created in FIRREA an administrative claims process for banks placed in receivership with the FDIC, *see id.* § 1821(d)(3)-(13), which "applies to any claim (i) seeking payment from, or a determination of rights with respect to, the assets of a failed bank for which the FDIC has been appointed receiver, or (ii) relating to any act or omission of such failed bank or the receiver," *Rise Dev. Partners*, 2023 WL 4364864, at *2 (citing 12 U.S.C. § 1821(d)(13)(D)(i)-(ii)).  *See Rundgren v. Washington Mut. Bank, FA*, 760 F.3d 1056, 1060 (9th Cir. 2014) ("The comprehensive claims process allows the FDIC to ensure that the assets of a

failed institution are distributed fairly and promptly among those with valid claims against the institution, and to expeditiously wind up the affairs of failed banks, without unduly burdening the District Courts." (internal citations and quotation marks omitted)); *Rise Dev. Partners*, 2023 WL 4364864, at *2 ("FIRREA establishes an administrative claims review process for the prompt and efficient resolution of claims brought against a failed financial institution placed under receivership." (citing 12 U.S.C. § 1821(d)(3)-(13)). Subparagraphs 5 through 8 of Section 1821(d) lay out the administrative process for review and disposition of such claims. Once a claim is filed, the FDIC has 180 days to determine whether to allow or disallow a claim. 12 U.S.C. § 1821(d)(5)(A). Within sixty days after disallowance of any portion of a claim, the claimant may file suit "in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia." *Id.* § 1821(d)(6)(A). Judicial review involving claims of this nature is restricted:

> Except as otherwise provided in [Section 1821(d)], no court shall have jurisdiction over–
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

*Id.* § 1821(d)(13)(D). Exhaustion of the administrative claims process set forth in Section 1821(d) is jurisdictional. *See Carlyle Towers Condo. Ass'n, Inc. v. F.D.I.C.*, 170 F.3d 301, 307 (2d Cir. 1999) ("[S]ection 1821(d)(13)(D), when read in conjunction with the rest of section 1821(d), creates a requirement that all claims must be presented to the FDIC before a claimant may seek judicial review.").

In addition to these provisions concerning the adjudication of claims, two other parts of FIRREA are relevant here.  First, FIRREA's anti-injunction provision limits a court's remedial jurisdiction as follows: "Except as provided in [Section 1821], no court may take any action, except at the request of the [FDIC] Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the [FDIC] as conservator or a receiver."  12 U.S.C. § 1821(j).  Second, FIRREA imposes a broad limitation on the FDIC's liability:

> The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corporation's authority under subsection (n) of this section or section 1823 of this title.

*Id.* § 1821(i)(2).

Also relevant to the instant motion is a statutory provision known as the Systemic Risk Exception, codified at 12 U.S.C. § 1823(c)(4)(G)(i).  As a general matter, when acting as receiver of a failed depository institution, the FDIC must comply with the "least-cost resolution" ("LCR") rule, *id.* § 1823(c)(4), which requires the FDIC to "satisfy [its] obligations to an institution's insured depositors at the least possible cost to the Deposit Insurance Fund," *id.* § 1823(c)(4)(B); *see also id.* § 1823(c)(4)(A).  The Systemic Risk Exception exempts the FDIC from adhering to the LCR rule if the Secretary of Treasury, in consultation with the President of the United States and upon a written recommendation of at least two-thirds of the Boards of the FDIC and the Federal Reserve, determines that "(I) the [FDIC]'s compliance with [the LCR rule] with respect to an insured depository institution for which the [FDIC] has been appointed receiver would have serious adverse effects on economic conditions or financial stability; and (II) any action or assistance under this subparagraph would avoid or mitigate such adverse effects."  *Id.* § 1823(c)(4)(G)(i).  The Secretary must document any decision to invoke the Systemic Risk

Exception, the Government Accountability Office must review that determination, and the Secretary must notify the Senate's Committee on Banking, Housing, and Urban Affairs and the House of Representative's Committee on Financial Services[12] within three days of the determination. *Id.* § 1823(c)(4)(G)(iii)-(v).

### C.  Analysis

Defendants argue that withdrawal of the reference is mandatory, citing a lengthy list of subsections from Section 1821 and Section 1823 that are purportedly implicated in the Adversary Proceeding, several of which they maintain deprive the bankruptcy court and this Court of subject matter jurisdiction over this case.  *See* Motion at 8-9.  Defendants additionally contend that adjudication of SVB Group's claims requires interpreting the scope and import of the Secretary's invocation of the Systemic Risk Exception, a provision which never before has been "applied to the resolution of a bank in an FDIC receivership."  *Id.* at 13.  In particular, Defendants argue that SVB Group's novel contention that the invocation of the Systemic Risk Exception requires "FDIC-C and FDIC-R1 to 'immediately' satisfy the receiver's uninsured-deposit liability by seeking funding from the Deposit Insurance Fund," *id.*, "runs headfirst into multiple substantive provisions

---

[12] The text of Section 1823(c)(4)(G) refers to the House of Representative's Committee on Banking, Finance and Urban Affairs, which no longer exists.  The Court construes references to that Committee as references to the House of Representative's Committee on Financial Services. *See* 2 U.S.C. Ch. 2 (Organization of Congress) (explaining that "the Committee on Banking, Finance and Urban Affairs of the House of Representatives shall be treated as referring to the Committee on Banking and Financial Services of the House of Representatives," and noting that the "Committee on Banking and Financial Services of House of Representatives [was] abolished and replaced by Committee on Financial Services of House of Representatives"); *see also* References in Law to Committees of the House of Representatives, Pub. L. No. 104-14, 109 Stat. 186, § 1(a)(2) (June 3, 1995) ("[T]he Committee on Banking, Finance and Urban Affairs of the House of Representatives shall be treated as referring to the Committee on Banking and Financial Services of the House of Representatives."); H.R. Res. 5, § 2(d), 107th Cong. (2001) (establishing the Committee on Financial Services); H.R. Res. 6, § 202(c), 104th Cong. (1995) (establishing the Committee on Banking and Financial Services).

of Title 12 that are intended to ensure the independence of and to confer discretion on the FDIC as receiver," Tr. at 10:16-19, and raises issues of first impression under non-bankruptcy federal law.  Motion at 13.[13]

SVB Group responds by first maintaining that resolution of Defendants' exhaustion arguments falls within the bankruptcy court's authority to decide its own jurisdiction, and merely entails a simple application of existing federal law.  Opposition at 12-16.  Furthermore, while SVB Group concedes that there is no authority on the impact of the Systemic Risk Exception in this scenario, Tr. at 25:12-16, it argues that the Secretary clearly guaranteed payment of the full Deposit Account Total when she invoked the Exception, such that determination of Defendants' resulting obligations implicates no novel or even ambiguous question of federal law.  Opposition at 17-18. Finally, SVB Group contends that any determination as to FDIC-R1's putative setoff rights (the validity of which it disputes) is properly left to the bankruptcy court.  *Id.* at 18-19.

As to the jurisdictional defenses raised in the Adversary Proceeding, Defendants first argue that SVB Group's failure to exhaust the administrative claims process as required by Section 1821(d)(13)(D) bars its claims in the Complaint, and that, even upon exhaustion, Section 1821(d)(6)(A) requires that the action be brought only in the District Court for the Northern District of California or the District Court for the District of Columbia.  FDIC-C Motion to Dismiss at 13-16; FDIC-R1 Motion to Dismiss at 8-15, 18-20; FDIC-R2 Motion to Dismiss at 12-19.  If SVB Group's claims are determined to fall within the scope of Section 1821(d)(13)(D)(i) or (ii),

---

[13] In its Joinder, FDIC-R2 adopts FDIC-R1's arguments, without offering any additional grounds for withdrawal of the reference.  *See* FDIC-R2 Joinder ¶ 14.  FDIC-C supplements FDIC-R1's moving brief by citing 12 U.S.C. § 1821(f) as an additional provision of federal law necessarily implicated by the Adversary Proceeding and refers the Court to the arguments made in that respect in its motion to dismiss in the Adversary Proceeding.  FDIC-C Joinder at 3 n.2 (citing FDIC-C Motion to Dismiss at 9-10).

then Section 1821(d)(13)(D) would indeed impose a jurisdictional bar on judicial review. *Carlyle Towers Condo. Ass'n*, 170 F.3d at 307. But Section 1821(d)(13)(D) applies only to such "claims that could be brought under the administrative procedures of § 1821(d), not any claim at all involving the FDIC." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 921 (2d Cir. 2010).

SVB Group argues that its claims are not the type governed by Section 1821(d) because the

> claims are based upon the undertaking of the Secretary of the Treasury under the systemic risk exception to provide all depositors of SVB with immediate access to the full amount of their insured and uninsured deposits on the day following the invocation of the systemic risk exception, *without* going through any claims process and *without* regard to the liquidation value of the bank.

Opposition at 16-17. SVB Group explains in other words that "this is not an 1821(d) issue" because it does not seek "adjudication for the assets of the receivership"; rather, according to SVB Group, its claims are premised on its "property right" (purportedly arising out of the Secretary's invocation of the Systemic Risk Exception) in the Deposit Account Total, and merely seeks turnover of that property. Tr. at 24:17-25:11. Conceding that this argument has never been made before, SVB Group nonetheless urges that the "threshold question of whether the [Deposit Account Total is] an asset of the bankruptcy estate" requires only the "simple application" of federal law. Opposition at 15 (citations omitted).

Determining whether SVB Group's claims against FDIC-C, FDIC-R1, and FDIC-R2 are "claims that could be brought under the administrative procedures of § 1821(d)" plainly requires extensive consideration of non-Title 11 federal law. SVB Group's insistence that resolution of this threshold dispute entails merely a straightforward application of FIRREA's exhaustion requirements, *see* Opposition at 12-15, ignores the novelty and complexities it presents.

19

SVB Group endeavors to analogize the circumstances here to those in *In re Cis. Corp.*, 140 B.R. 351 (S.D.N.Y. 1992), where the court denied a motion to withdraw the reference.  Opposition at 13.  But the application of FIRREA's exhaustion requirements in that case did not require significant interpretation of federal law.  At issue in *In re Cis Corp.* was a dispute over whether a bank in receivership had "a security interest in certain equipment" and "require[d] consideration of FIRREA only to determine whether the Bankruptcy Court ha[d] subject-matter jurisdiction" based on the argument that the plaintiff-debtor failed to exhaust its administrative remedies under Section 1821(d).  140 B.R. at 352-53.  This issues here are far less straightforward.  A security interest in tangible property is hardly comparable to SVB Group's novel contention that it possesses a property right in the Deposit Account Total by virtue of the Systemic Risk Exception invocation.

*In re Temecula Valley Bancorp*, 523 B.R. 210 (C.D. Cal. 2014), also relied upon by SVB Group, *see* Opposition at 16 n.11, further illustrates how the circumstances here are meaningfully different from one where withdrawal is not required.  Like this case, *In re Temecula Valley Bancorp* involved a bank holding company that filed for bankruptcy and a subsidiary bank that was placed into FDIC-administered receivership.  523 B.R. at 213.  There, the dispute centered on whether tax refunds the holding company secured after filing tax returns on behalf of both itself and the subsidiary bank were, in part, owed to the subsidiary.  *Id.*  The bankruptcy trustee for the bank holding company commenced an adversary proceeding seeking a declaration that it did not owe any refunds to the subsidiary bank, and the FDIC, as receiver for the subsidiary, argued for withdrawal of the reference because, in light of FIRREA's exhaustion requirements under Section 1821(d)(13)(D), "no court ha[d] jurisdiction over the adversary proceeding, but that making that determination would involve substantial questions of federal law that should be handled by an

Article III court." *Id.* at 215.  The court rejected this argument, reasoning that the question of whether the tax refund is an asset of the receivership estate or of the bankruptcy estate did not require substantial and material consideration of non-Title 11 federal law. *Id.* at 216-19.  But like the alleged security interest in equipment at issue in *In re Cis Corp.*, a tax refund presents a relatively familiar legal concept.  *Cf. In re Extended Stay, Inc.*, 466 B.R. 188, 203-04 (S.D.N.Y. 2011) (denying motions to withdraw the bankruptcy reference because, *inter alia*, the movants "failed to demonstrate that—on the basis of a handful of claims out of 125 total claims—federal non-bankruptcy law [would] 'dominate' other issues").  In contrast, SVB Group's novel argument that it retains a property interest in the Deposit Account Total requires consideration of the Secretary of Treasury's invocation of a statutory exception that never before has been invoked in analogous circumstances.

That novel issue is, after all, the central question presented in the Adversary Proceeding. Whatever court adjudicates that proceeding must determine whether, and if so how, the Section 1821(d) administrative exhaustion requirement (as well as other FIRREA and Title 12 provisions discussed below) applies to SVG Group's efforts to recover the Deposit Account Total.  As SVB Group's counsel distilled at oral argument: "The issue here is: *Do we have a property right* based upon the fact that the [S]ecretary of the [T]reasury" stated that all uninsured deposits would be guaranteed?  Tr. at 25:24-25 (emphasis added); *accord id.* at 24:17-25:11.  Indeed, SVB Group's briefing devotes significant attention to arguing the effect of the Secretary's unprecedented action of invoking the Systemic Risk Exception following SVB's failure, suggesting the novelty and complexity of that issue.  Opposition at 16-17; *see In re Enron Corp.*, 388 B.R. 131, 139 (S.D.N.Y. 2008) (noting that by "devot[ing] a substantial portion of its opposition to arguing the merits of its theory" a party had "contradict[ed] its own position that mandatory withdrawal of the reference is

not warranted").

Yet despite this extensive briefing, SVB Group offers no caselaw interpreting the import of the Systemic Risk Exception or supporting its associated claimed entitlement to funds held in a deposit account of a bank in receivership.  Nor does there appear to be any.  That should not come as a surprise; the Exception has never been deployed as it was here.  Prior to SVB's failure, the Exception had only been invoked during the 2008-2009 Financial Crisis, and even then, the invocation was not in connection with a bank placed into receivership.  *See* Marc Lavonte, Cong. Rsch. Serv., IF12378, *Bank Failures: The FDIC's Systemic Risk Exception* at 2, (2023), available at https://crsreports.congress.gov/product/pdf/IF/IF12378; *see also* Tr. at 5:22-6:10.  Furthermore, SVB Group's asserted property right in the Deposit Account Total relies largely on public statements by the Secretary and the FDIC in press releases and congressional testimony, *see, e.g.*, Tr. at 28:7-29:2, yet it provides no authority attaching legal significance to such public statements with respect to the scope and significance of the Secretary's invocation of the Exception.

SVB Group's unprecedented contentions further bear on Defendants' two other jurisdictional defenses.  In the Adversary Proceeding, FDIC-R1 and FDIC-R2 assert that Section 1821(j),which limits a court's power to enjoin the FDIC's exercise of its authority as receiver, bars the ultimate relief sought by SVB Group, regardless of whether SVB Group's claims against them are styled as a turnover claim (Count II), an asserted violation of the Bankruptcy Code's stay provision (Count III), or a claim for declaratory relief (Count IV).  FDIC-R1 Motion to Dismiss at 15-18; FDIC-R2 Motion to Dismiss at 20-22; *see also* Tr. at 10:10-13 ("[U]nder Section 1821(j), the bankruptcy court and all courts are stripped of authority to enter an order that interferes with the Title 12 claims allowance process.").  In addition to arguing that "section 1821(j)'s limitation does not inhibit the operation of the automatic stay imposed by Congress," SVB Group counters

that its turnover claim is based on the obligations of the FDIC in its corporate capacity (obligations that, once again, purportedly arise from the Secretary's invocation of the Exception), and thus "has nothing whatsoever to do with" FDIC-R1's or FDIC-R2's "actions or operations as Receivers." Adversary Proceeding, Dkt. 51 at 25-27.   Resolution of these issues, especially against the backdrop of the Secretary's unprecedented action, requires far more than a routine application of FIRREA's anti-injunction provision and the various other Title 12 provisions implicated by the parties' arguments. *See In re Colonial Realty Co.*, 980 F.2d 125, 128 n.5 (2d Cir. 1992) (observing in *dicta* that the district court should have granted the FDIC's motion to withdraw the bankruptcy reference where, *inter alia*, issues of first impression regarding the interaction of 12 U.S.C. § 1821(j) and the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362, were presented).

Finally, FDIC-C raises a third jurisdictional defense, contending that Section 1821(f), in conjunction with the APA, imposes an additional jurisdictional hurdle to the claims asserted against it.  FDIC-C Motion to Dismiss at 9-10; *see* 12 U.S.C. § 1821(f)(4) ("A final determination made by the [FDIC] regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with chapter 7 of title 5 by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located."). FDIC-C argues that the APA only permits review of final agency action, *see* 5 U.S.C. § 704, which creates a jurisdictional exhaustion bar to SVB Group's claims against it.  FDIC-C Motion to Dismiss at 9.  Once again, SVB Group's rebuttal against the applicability of this provision implicates its novel arguments on the import of the Systemic Risk Exception invocation. *See, e.g.*, Adversary Proceeding, Dkt. 52 at 16 ("Section 1821(f) does not apply where, as here, [SVB Group] seeks (1) turnover of **uninsured** deposits (2) that were guaranteed under Section 1823(c)(4)(G) under powers exercised by the FDIC-C upon the direction of the Secretary of the Treasury."); *see*

23

*also* Tr. at 19:22-20:3 (FDIC-C's attorney arguing: "[T]he one thing I will concede on this debate, whether it's an 1821(f) claim or it's an 1823(c)(4)(G) claim is that the parties spilled a lot of ink on it . . . and there is no case law weighing [in on] that determination.  That is quintessentially, your honor, that is the epitome of an issue, an interpretative issue of first impression.").  Determination of this issue as well clearly requires substantial consideration of non-Title 11 federal law.

The preceding analysis suffices to mandate withdrawal.  But even setting aside these thorny jurisdictional questions, consideration of the merits of SVB Group's claims also requires extensive interpretation of non-bankruptcy law in an undisputedly novel context.  In opposing withdrawal of the reference, SVB Group does not address Defendants' assertion that resolution of these issues necessitates substantial consideration of "multiple substantive provisions of Title 12," Tr. at 10:17; *see also* Motion at 13-14.  Rather, SVB Group lodges substantive attacks on the validity of Defendants' underlying arguments for dismissal of the Complaint.  SVB Group's contentions, however, only further underscore why withdrawal is mandatory in these circumstances.

For example, in the Adversary Proceeding, Defendants argue for dismissal on the grounds that following the invocation of the Systemic Risk Exception, the FDIC has sole discretion regarding any assistance it elects to provide.  FDIC-C Motion to Dismiss at 17-19; FDIC-R1 Motion to Dismiss at 24; FDIC-R2 Motion to Dismiss at 4; *see also* 12 U.S.C. § 1823(c)(4)(G)(i); *id.* § 1823(c)(4)(F) ("Any determination which the Corporation may make under this paragraph [4] shall be made in the sole discretion of the Corporation.").  They argue that this discretion empowers the FDIC to refuse to pay the Deposit Account Total to SVB Group.  FDIC-C Motion to Dismiss at 17-18; FDIC-R1 Motion to Dismiss at 21-22, 24; FDIC-R2 Motion to Dismiss at 4, 29.  In urging withdrawal of the reference, Defendants thus contend that resolution of this issue

necessarily requires extensive interpretation of various Title 12 provisions, which they maintain afford the FDIC with such discretion.  *See, e.g.*, Motion at 13-14 (citing 12 U.S.C. §§ 1823(c)(4)(A), (G); 1821(i)(2), (3)); Tr. at 10:20-11:19 (citing 12 U.S.C. §§ 1821(c)(3)(C), 1821(d)(10)(A), 1821(i)(3)(A), 1823(c)(4)(F), (G)).  In opposing withdrawal, SVB Group argues that the FDIC's discretion was curtailed by the Secretary's statements, such that the FDIC is now obligated to turn over the Deposit Account Total.  Opposition at 17-18.  Yet, here too, and for many of the reasons already discussed, resolving the scope of the FDIC's discretion in this space, and whether that discretion was curtailed by the unprecedented action of the Secretary, will require a court to confront novel issues of non-bankruptcy federal law.

Defendants also argue for dismissal of the Complaint by invoking multiple subsections of Section 1821(i).  FDIC-C Motion to Dismiss at 19-20; FDIC-R1 Motion to Dismiss at 21-22; FDIC-R2 Motion to Dismiss at 29.  Defendants assert that Section 1821(i)(2) caps Defendants' liability at the amount SVB Group would have received if the FDIC had liquidated the assets and liabilities without invoking the Systemic Risk Exception and that Section 1821(i)(3)(A) grants the FDIC the discretion to cover some, but not all, of the uninsured deposits previously held at SVB. FDIC-C Motion to Dismiss at 19; FDIC-R1 Motion to Dismiss at 21-22, 24; FDIC-R2 Motion to Dismiss at 4, 29.  Once again, the application of these provisions of Section 1821(i) will require novel interpretation of federal law that is entirely distinct from the Bankruptcy Code.  In fact, in arguing why there should not be a setoff, SVB Group largely dodges any analysis of Section 1821(i), instead asserting that the bankruptcy court can resolve the issue in its capacity of determining creditor claims under 11 U.S.C. § 553(a).[14]  Opposition at 18-19.  This argument,

---

[14] Section 553 of Title 11 permits the assertion of "setoff" rights.  Title 11 "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under [Title 11] against a claim of such creditor against the debtor

however, elides the withdrawal question presented by the instant motion.  The problem for SVB Group remains that the bankruptcy court would need to engage in substantial and material consideration of non-bankruptcy federal law given the significant interpretative questions posed by the application of Section 1821(i) here.  For example, the Ad Hoc Group of Senior Noteholders' opposition to Defendants' motions to dismiss argues that Section 1821(i)(2) is irrelevant because its liability limitation does not apply to insured depositors, as used in the statute, and SVB Group qualifies as such a depositor due to the Systemic Risk Exception invocation.  *See* Adversary Proceeding, Dkt. 55 at 18-19.[15]  Deciding this question would present yet another unique issue of federal law.

The Second Circuit has commented that "national bank receiverships . . . present special challenges and circumstances."  *Resol. Tr. Corp. v. Elman*, 949 F.2d 624, 629 (2d Cir. 1991).  That is certainly the case with respect to the Adversary Proceeding, which presents a litany of novel and

---

that arose before the commencement of the case."  11 U.S.C. § 553(a).  "Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy."  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).

[15] Section 1821(i)(1) limits the application of subsection (i) to "the rights of the creditors (*other than insured depositors*)" of the relevant institution.  12 U.S.C. § 1821(i)(1) (emphasis added).  The term "insured depositors" is not defined, but "insured deposit" is defined as "the net amount due to any depositor for deposits in an insured depository institution as determined under sections 1817(i) and 1821(a)" of Title 12.  12 U.S.C. § 1813(m).  Section 1817(i) governs insurance of trust funds, and is thus irrelevant here.  Section 1821(a)(B) states that "[t]he net amount due to any depositor at an insured depository institution shall not exceed the standard maximum deposit insurance amount determined in accordance with subparagraphs (C), (D), (E), and (F) and paragraph (3)."  Subparagraph (E) sets the standard $250,000 insurance limit, but then states that "any payment on a deposit claim made by the [FDIC] as receiver or conservator to a depositor *above the standard maximum deposit insurance amount* in effect at the time of the appointment of the [FDIC] . . . shall be deemed to be part of the net amount due to the depositor under subparagraph (B)."  *Id.* § 1821(a)(E).  The parties dispute the effect of this definition.  The Ad Hoc Group of Senior Noteholders contends that the effect of carving out "insured depositors" is to exclude SVB Group because it effectively became an insured depositor upon invocation of Systemic Risk Exception, *see* Adversary Proceeding, Dkt. 55 at 18-19, whereas FDIC-R1 argues that SVB Group's claims are for uninsured deposits, *see id.*, Dkt. 70 at 19, n.13.

important federal law questions.  Resolution of that proceeding will require a court to determine complicated and novel legal issues implicating various provisions of Title 12.  This entails "significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *Exxon Corp.*, 932 F.2d at 1026.  Withdrawal of the reference is thus required.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion to withdraw the bankruptcy reference of the Adversary Proceeding is granted.  By December 18, 2023, the parties are directed to submit a joint letter advising the Court on the following matters that were pending in the Adversary Proceeding: (1) whether any party requests to submit supplemental briefing in connection with Defendants' motions to dismiss the Complaint; (2) whether any party requests oral argument on Defendants' motions to dismiss; (3) whether FDIC-R1 continues to request that judicial notice be taken of certain information and, if so, whether any party requests to submit additional briefing on that issue; (4) whether SVB Group continues to seek a preliminary injunction; and (5) whether any party requests an evidentiary hearing in connection with SVB's motion for an injunction.  The parties also shall include in the joint letter an update on the status of discovery and file a proposed case management plan and scheduling order, a template of which can be found here: https://www.nysd.uscourts.gov/hon-john-p-cronan.

In addition, by December 18, 2023, the parties shall file in this case the following documents that were filed in the Adversary Proceeding: submissions in connection with Defendants' motions to dismiss, *see* Adversary Proceeding, Dkts. 25, 28, 32, 51, 52, 55-57, 70-71, 74, FDIC-R1's motion for judicial notice, *id.*, Dkt. 72, and SVB Group's motion for an injunction, *id.*, Dkts. 40-42, 50, 61-62.

The parties shall also appear for a status conference to discuss the foregoing topics on

December 20, 2023, at 4:30 p.m.  The status conference will take place in Courtroom 12D of the

Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, NY 10007.

The Clerk of Court is respectfully directed to close the motion pending at Docket

Number 1.

SO ORDERED.

Dated:  December 13, 2023
          New York, New York

_____
JOHN P. CRONAN
United States District Judge