# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

December 19, 2023

*Via ECF and Email*

The Honorable John P. Cronan,
    United States District Judge,
        Southern District of New York,
            500 Pearl Street,
                New York, NY  10007-1312,
                    CronanNYSDChambers@nysd.uscourts.gov.

Re:    *SVB Financial Group* v. *Federal Deposit Insurance Corporation*,
        No. 23 Civ. 7218 (JPC) (S.D.N.Y.)

Dear Judge Cronan,

I write on behalf of SVB Financial Group, the debtor-plaintiff ("Plaintiff") in the above-captioned matter.  As referenced in the joint letter submitted by the parties on December 18, 2023, Plaintiff today filed a complaint in the United States District Court for the Northern District of California, challenging the FDIC-C's purported administrative denial of Plaintiff's $1.93 billion demand for access to or payment of its account funds.  A copy of the complaint is attached to this letter as **Exhibit A**.

Respectfully submitted,

*/s/ Robert A. Sacks*

Robert A. Sacks

cc:    All Counsel

## EXHIBIT A

Robert A. Sacks (SBN 150146)
(sacksr@sullcrom.com)
Adam S. Paris (SBN 190693)
(parisa@sullcrom.com)
Diane L. McGimsey (SBN 234953)
(mcgimseyd@sullcrom.com)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:   (310) 712-8800

*Attorneys for Plaintiff SVB Financial Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SVB FINANCIAL GROUP,<br><br>               Plaintiff,<br><br>        v.<br><br>FEDERAL DEPOSIT<br>INSURANCE CORPORATION,<br>in its corporate capacity,<br><br>               Defendant. | Case No.:<br><br>**COMPLAINT** |

Plaintiff SVB Financial Group ("SVBFG") brings this Complaint against Defendant Federal Deposit Insurance Corporation ("FDIC"), in its corporate capacity ("FDIC-C"), and alleges as follows:

## INTRODUCTION

1.      SVBFG is entitled to recover approximately $1,933,805,708.13 (the "Account Funds") that the FDIC-C has unlawfully withheld by defying the March 12, 2023 invocation of the systemic risk exception by Secretary of the Treasury Janet Yellen—made, as required by statute, upon the unanimous recommendations of the boards of both the Federal Reserve and the FDIC-C, and after consulting with the President of the United States.  The Secretary's invocation provided that the FDIC-C would pay *all* deposits of *all* depositors of the former Silicon Valley Bank after it had been closed by the California Department of Financial Protection and Innovation ("DFPI") just 2 days prior.

2.      The March 12, 2023 invocation by Secretary Yellen, which was an exercise of the statutory authority given exclusively to the Secretary of the Treasury by Congress, was publicly announced in a joint statement by the Secretary, Federal Reserve Board Chair Jerome Powell, and FDIC Chairman Martin Gruenberg.  The Secretary's decision, which was designed to calm uninsured depositors' fears in order to prevent runs on additional banks and protect the Nation's banking system from collapse, left no ambiguity:  it "fully protect[ed] *all* depositors" who "[would] have access to *all* of their money starting Monday, March 13."  The lawless acts now being carried out by administrators at the FDIC-C are in direct contravention of the plain terms of the Treasury Secretary's invocation of the systemic risk exception and undermine the system the FDIC is supposed to be protecting.

3.      Consistent with the Treasury Secretary's determination and the public statement made by the heads of three of the Nation's most important agencies, the next day, March 13, the FDIC transferred all Silicon Valley Bank deposits,

1  including the approximately $2.1 billion in SVBFG's accounts at Silicon Valley

2  Bank, to a newly created bank, the Silicon Valley Bridge Bank, N.A. ("Bridge

3  Bank").  As the FDIC-C itself publicly disclosed in announcing this action

4  pursuant to the Treasury Secretary's systemic risk determination, on March 13 it

5          transferred *all* deposits—insured and uninsured— . . . to a newly

6          created, full-service FDIC-operated 'bridge bank' in an action designed

7          to protect *all* depositors of Silicon Valley Bank . . . .  The transfer of ***all***

8          deposits was completed under the systemic risk exception approved

9          yesterday.  *All* depositors of the institution will be made whole . . . .

10         Any losses to the Deposit Insurance Fund to support uninsured

11         depositors will be recovered by a special assessment on banks, as

12         required by law.

13  In other words, all deposits of all depositors were transferred to Bridge Bank to

14  carry out Secretary Yellen's invocation of the systemic risk exception, which

15  mandated the payment of *all* deposits of *all* depositors of Silicon Valley Bank,

16  including uninsured deposits, from the FDIC-administered Deposit Insurance

17  Fund, with any losses to be recouped from assessments on banks whose payments

18  fund the Deposit Insurance Fund.

19         4.      SVBFG's deposits appeared on the books and records of Bridge Bank,

20  and SVBFG, like other Silicon Valley Bank depositors, was granted full access to

21  those funds beginning on March 13.  During the next three days, SVBFG withdrew

22  approximately $180 million of its deposit funds to pay ordinary-course obligations

23  and to prepare for its bankruptcy filing, but SVBFG left the vast bulk of its funds at

24  Bridge Bank, in reliance on the public pronouncements of Secretary Yellen and the

25  FDIC itself that all depositors were protected and the funds on deposit at Bridge

26  Bank belonged to SVBFG.

27         5.      However, on Thursday, March 16, the FDIC unexpectedly and

28  unlawfully cut off SVBFG's access to its remaining approximately $1.93 billion of

funds at Bridge Bank.  The FDIC's act was tantamount to theft, and was contrary to its public assurances that all depositors' funds at Bridge Bank were safe.  The FDIC acted without notice or disclosure of its conduct or the justification for it. And although the FDIC-C has apparently cooperated fully with the FDIC as receiver for Silicon Valley Bank ("FDIC-R1") and the FDIC as receiver for Bridge Bank ("FDIC-R2"), none of the FDIC-C, FDIC-R1 or FDIC-R2 has disclosed upon whose authority or at whose direction SVBFG's funds were withheld or actually taken, or on what basis.

6.     To be clear, the FDIC-C initially complied with its mandate to provide SVBFG, like all other depositors of the former Silicon Valley Bank, with immediate access to all its funds formerly on deposit at Silicon Valley Bank when it made those funds available to SVBFG at Bridge Bank.  But, the FDIC-C then reversed course and blocked access to SVBFG's funds without providing any authority, or even an explanation, for doing so.  The FDIC-C is responsible for the wrongful denial of SVBFG's access to or the taking of SVBFG's $1.93 billion starting on March 16, 2023, either because it did so itself, or it permitted, enabled, or authorized the FDIC-R1 and/or the FDIC-R2 to do so, and it has since refused, without justification, to restore SVBFG's access to its Account Funds.

7.     On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Following SVBFG's bankruptcy filing, the FDIC-C's continuing refusal to provide SVBFG access to its deposit funds also amounts to a continuing violation of the automatic stay imposed pursuant to 11 U.S.C. § 362.

8.     On June 26, 2023, in advance of filing an adversary proceeding in the Bankruptcy Court against the FDIC-C, SVBFG sent a letter to the FDIC-C demanding access to, or payment of, its $1.93 billion as required by the invocation of the systemic risk exception.  The FDIC-C did not even acknowledge receipt of

the letter until months later—months after SVBFG had already sued the FDIC-C and only after the subject had been raised by the Bankruptcy Court overseeing that adversary proceeding during a conference.

9.     On July 9, 2023, SVBFG filed an adversary proceeding in the Bankruptcy Court seeking, among other things, to recover the $1.93 billion that the FDIC-C funded and transferred to Bridge Bank but then wrongly blocked access to or seized from SVBFG's accounts at Bridge Bank (the "Adversary Proceeding"). Approximately one month later, the FDIC-C moved to dismiss SVBFG's complaint, taking the position that SVBFG was required to file an administrative claim pursuant to 12 U.S.C. § 1821(f) to demand the Account Funds from the FDIC-C and await a decision before pursuing legal relief.  No court has ruled on the FDIC-C's motion, and the Adversary Proceeding remains pending.

10.     SVBFG has made clear that its June 26, 2023 payment demand was not a claim for insured deposits under 12 U.S.C. § 1821(f) and instead was a demand for access to or payment of its *uninsured* Account Funds pursuant to the Treasury Secretary's invocation of the systemic risk exception.  Nevertheless, on September 14, 2023, the FDIC-C for the first time formally acknowledged SVBFG's June 26, 2023 payment demand and stated to the Bankruptcy Court that it intended to treat SVBFG's June 26 letter as a deposit claim under 12 U.S.C. § 1821(f)—which it was not.  On September 19, 2023, the FDIC-C submitted a letter to the Bankruptcy Court confirming the same.  On October 20, 2023, the FDIC-C issued a letter to SVBFG stating that it was denying SVBFG's "claim."  Prior to the FDIC-C's purported decision denying SVBFG's "claim," it had no communication with SVBFG about a claim or claims process of any kind, much less identification or discussion about an administrative or adjudicative process.

11.     In rejecting the June 26 payment demand, the FDIC-C contended that: (i) it has already satisfied its obligation to pay SVBFG the maximum deposit

1   insurance amount of $250,000 set forth in section 1821(a)(1)(E); and (ii) the

2   Treasury Secretary's invocation of the systemic risk exception "did not impose any

3   legal obligation on [the] FDIC-C to pay SVBFG for its uninsured deposits or cause

4   [the] FDIC-C to guarantee SVBFG's uninsured deposits."

5        12.    Apart from the fact that the FDIC-C has no actual or legitimate claims

6   process related to Silicon Valley Bank or Bridge Bank, the various procedural and

7   substantive excuses the FDIC-C has advanced are manufactured and baseless, and

8   in all events, they provide no justification for engaging in self-help without any

9   process by taking and continuing to withhold SVBFG's $1.93 billion, which

10  should be restored to SVBFG as of March 16, 2023.

11       13.    *First*, by asserting that SVBFG was obligated to file a claim with the

12  FDIC-C for its deposits, the FDIC-C has it backwards.  SVBFG was initially

13  provided with access to all its funds on March 13, 2023, like all other former

14  Silicon Valley Bank depositors, pursuant to and as required by the Secretary of the

15  Treasury's invocation of the systemic risk exception.  The FDIC-C had no right to

16  interfere with SVBFG's continued access to the Account Funds or to take

17  SVBFG's deposits.  Indeed, SVBFG would not have retained its deposits at Bridge

18  Bank, and neither would any other depositor have done so, had the Treasury

19  Department, Federal Reserve, and FDIC together (or the FDIC-C alone) qualified

20  the announced protection of all Silicon Valley Bank deposits in full with an ability

21  to secretly withdraw the guarantee and eliminate the deposit, indiscriminately and

22  without notice or due process, at any time while the deposit remained at Bridge

23  Bank.  The FDIC-C's actions are lawless, run afoul of the turnover obligations

24  owed to SVBFG as debtor, and are a violation of the Bankruptcy Code's automatic

25  stay.

26       14.    *Second*, there is no dispute as to either SVBFG's ownership of, or the

27  current amount of, the funds that were in SVBFG's accounts at Silicon Valley

28  Bank or at Bridge Bank.  The FDIC-C's sole claimed basis for blocking access to

and denying payment of the Account Funds is either its contention that (i) the Secretary of the Treasury's invocation of the systemic risk exception to protect all uninsured depositors of Silicon Valley Bank did not actually apply to SVBFG's deposits, even though that directly contravenes the clear language used by the Secretary and repeated by FDIC Chairman Gruenberg and the Federal Reserve Vice Chair of Supervision Michael Barr (among others); or (ii) it can ignore the Secretary's determination and invocation, and its own Chairman's unequivocal statements, and can instead assert that the FDIC-C has the sole and unfettered discretion to determine whether to pay SVBFG, or any other Silicon Valley Bank depositor, the amount of its uninsured account funds. These are legal issues to be determined by a court, not by the FDIC-C itself, in a "claims" process it created solely for SVBFG and for the sole purpose of denying SVBFG's "claim."

15. The FDIC-C's positions are without merit. As a substantive matter, the Treasury Secretary's invocation of the systemic risk exception obligated the FDIC-C's Deposit Insurance Fund to pay *all* deposits of *all* depositors at Silicon Valley Bank and entitled SVBFG like all other depositors to receive its deposits. The FDIC-C has no authority or discretion unilaterally to repudiate this commitment or prevent a depositor like SVBFG from accessing its deposit funds. The FDIC-C knows this, or else it would not have made the public statements it made or transferred all of SVBFG's uninsured deposits to Bridge Bank on March 13, 2023, in accordance with Secretary Yellen's determination and invocation.

16. The Treasury Secretary did not leave it to the discretion of administrators at the FDIC to pick which depositors to pay, in what amounts and at what time. If that had been the case, the Secretary of the Treasury, the Chair of the Federal Reserve, and the Chair of the FDIC would have stated as much in the March 12 public announcement of the Treasury Secretary's determination and invocation of a systemic risk exception because that announcement was made with

-7-

the explicit purpose of communicating to depositors the parameters within which the federal government was willing to act to protect the nation's financial markets from crashing. But that is not what the Treasury Secretary—or any other senior federal government official—said then or in the many months since. Until the FDIC-C filed its motion to dismiss the Adversary Proceeding complaint on August 11, 2023, the government officials responsible for the recommendation to invoke and the actual invocation of the systemic risk exception repeatedly confirmed that the scope of the invocation protected *all* deposits of *all* depositors of the former Silicon Valley Bank based on the judgment that such action was necessary to stabilize the United States banking system and address the contagion that was spreading throughout the system.

17.   Furthermore, all of SVBFG's uninsured deposits were transferred to Bridge Bank as the Treasury Secretary dictated; those funds belonged to SVBFG and SVBFG had full access to them. No action by the Treasury Secretary nor any statute provided the FDIC-C—or the FDIC-R1 or FDIC-R2—with any authority at all to simply take those funds—which were not assets of Silicon Valley Bank or the FDIC as receiver for Silicon Valley Bank or the FDIC in any other capacity, but were assets belonging to SVBFG—away from SVBFG, as happened here.

18.   *Third*, putting aside the incongruity of the FDIC-C's position that SVBFG was obligated to file an administrative claim even though the conduct at issue is the FDIC-C blocking access to and/or taking SVBFG's deposit funds, the FDIC-C's position that SVBFG was required to exhaust the claims process for insurance coverage under 12 U.S.C. § 1821(f) before filing a complaint against the FDIC-C is simply wrong. Section 1821(f) only applies to claims for "insured deposits"—*i.e.*, deposits insured up to $250,000 under 12 U.S.C. § 1821(a)—not the guarantee to provide SVBFG's $1.93 billion of uninsured funds that were in SVBFG's accounts. SVBFG's claim to its $1.93 billion is not a claim for insurance coverage under section 1821(f), and it cannot be resolved through the

1  FDIC-C's so-called administrative claims process, assuming such a process existed

2  for Silicon Valley Bank or Bridge Bank depositors, which it did not and does not.

3       19.   *Finally*, even if SVBFG's claim is deemed a claim for insured

4  deposits under section 1821(f), the FDIC-C's alternative position that it need not

5  comply with the directive that **all** depositors be paid **all** their deposits, and that it

6  has unfettered discretion to pay or not to pay as administrators at the FDIC-C may

7  determine without any process whatsoever, its denial of FDIC-C's demand for

8  payment of the Account Funds is arbitrary, capricious, an abuse of discretion and

9  contrary to law. Further, the so-called process by which the FDIC-C purported to

10  assess SVBFG's demand was a sham.

11       (a)  The FDIC-C has not identified a single former Silicon Valley

12  Bank or Bridge Bank depositor, other than SVBFG, that was required to file a

13  claim with the FDIC-C to obtain access to its funds, and the FDIC-C provided no

14  notice of any FDIC-C claims process for Silicon Valley Bank or Bridge Bank

15  deposits.

16       (b)  The FDIC has not promulgated regulations governing a

17  section 1821(f) claims process, let alone defining its scope. (*SVB Fin. Grp.* v.

18  *FDIC*, No. 23-01137 (MG) (Bankr. S.D.N.Y.) ("Adv. Dkt.") No. 80-1 at 2; Adv.

19  Dkt. Sept. 14, 2023 Hr'g Tr. at 17:24-18:1.)

20       (c)  The FDIC-C never informed SVBFG that it—unlike all other

21  depositors—would be required to file a claim in its purported claims process

22  before it may recover its Account Funds.

23       (d)  The FDIC-C never provided any instructions to SVBFG (or any

24  other Silicon Valley Bank or Bridge Bank depositor) on when or how to submit a

25  claim under section 1821(f), and never identified what information a claim should

26  include or how it would be evaluated.

27       (e)  The FDIC-C does not have even a single document identifying the

28  existence, scope, or procedures applicable to a section 1821(f) claims process for

1   Silicon Valley Bank or Bridge Bank depositors.

2         (f)  The FDIC-C did not afford SVBFG any opportunity to submit

3   evidence or arguments in support of a claim for its deposits.  SVBFG's only

4   submission was its June 26, 2023 payment demand which, as the FDIC-C knows,

5   was not intended as an administrative claim.  To the contrary, the FDIC-C only

6   asserted that it intended to treat that letter as a timely claim for insurance coverage

7   on September 14, 2023, when the Bankruptcy Court raised due process concerns

8   with the FDIC-C's failure to implement any regulations or define and follow any

9   procedures with respect to its supposed section 1821(f) process.

10        20.    Even if the FDIC-C had the right to alter the scope of the Treasury

11   Secretary's invocation through its claims process (it does not) or, contrary to every

12   public statement, the Secretary's invocation actually left it wholly up to the

13   FDIC-C to determine whether it would protect uninsured deposits at all, and if so,

14   whom to pay and how much, the FDIC-C did not promulgate any regulations

15   prescribing procedures for resolving SVBFG's claim, provide SVBFG any notice

16   of the standards by which its claims would be evaluated, offer SVBFG any

17   opportunity to submit supporting evidence or arguments, or provide any

18   substantive rationale for deciding to take SVBFG's approximately $1.93 billion in

19   uninsured account funds after it had properly provided access to the same

20   uninsured Account Funds pursuant to, and in the days following, the invocation of

21   the systemic risk exception.  Quite simply, even if a claim pursuant to

22   12 U.S.C. § 1821(f) were required, the FDIC-C's denial of SVBFG's

23   section 1821(f) claim is "arbitrary, capricious, an abuse of discretion, or otherwise

24   not in accordance with law."  5 U.S.C. § 706(2)(A).

25        21.    As alleged more fully below, SVBFG is entitled to judgment restoring

26   its $1.93 billion as of the date its access was taken away, including interim

27   earnings on those funds, or a monetary judgment in the amount of $1.93 billion,

28   plus prejudgment interest, costs, and fees.  SVBFG is also entitled to such other

damages as may be proved at trial arising from Defendant's violation of the automatic stay.

### **JURISDICTION AND VENUE**

22.     This action arises under the laws of the United States, including, without limitation, the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq*., as amended, and the Administrative Procedures Act, 5 U.S.C. § 500 *et seq*., the Due Process Clause of the Fifth Amendment to the United States Constitution, the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*., and the Freedom of Information Act, 5 U.S.C. § 552 *et seq*.  The Court, therefore, has original jurisdiction over the asserted federal law claims pursuant to 28 U.S.C. §§ 1331, 1334.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because it is part of the same case or controversy.

23.     The improper conduct of the FDIC-C that is at issue in this action is already the subject of the Adversary Proceeding.  SVBFG files this action so that it does not prejudice its rights in the event it is determined that the FDIC-C has a valid section 1821(f) claims process and that the FDIC-C's October 20, 2023 letter constitutes a valid denial of SVBFG's claim (both of which SVBFG denies).  SVBFG does not waive its position that it has valid claims against the FDIC-C under the Bankruptcy Code for turnover of its $1.93 billion and violation of the automatic stay, both of which are core proceedings that should be determined in the Southern District of New York.

24.     Defendant FDIC-C is subject to suit in this Court.  Pursuant to 12 U.S.C. § 1819(a), the FDIC-C has the power to "[t]o sue and be sued."  This section constitutes a general waiver of sovereign immunity.  Defendant is also subject to suit for the claims asserted herein arising under the Bankruptcy Code, pursuant to the express waiver of sovereign immunity for such claims in 11 U.S.C. § 106.

25.     Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as the Account Funds were held at Silicon Valley Bank, which resided in this District, and following the closure of Silicon Valley Bank, the FDIC-C created Bridge Bank, which also resided in this District, and transferred all uninsured accounts, including SVBFG's accounts, to Bridge Bank.  Venue is also proper under 12 U.S.C. § 1821(f)(4), which provides that a final determination of the FDIC-C regarding a claim for insurance coverage "shall be a final agency action reviewable . . . by the United States district court for the Federal judicial district where the principal place of business of the depository institution is located."  Here, the FDIC-C has treated SVBFG's demand for payment of the Account Funds as a claim under 12 U.S.C. § 1821(f) and has issued a final determination on SVBFG's "claim," and the principal place of business of the depository institution, Silicon Valley Bank, is located in this District.

## DIVISIONAL ASSIGNMENT

26.     This action should be assigned to this Court's San Jose Division. Under Rule 3-2 of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part of the property that is the subject of the action is situated," and all civil actions that arise in the County of Santa Clara "shall be assigned to the San Jose Division."

27.     Consistent with the Treasury Secretary's systemic risk determination, on March 13, 2023, the FDIC transferred the approximately $2.1 billion in SVBFG's accounts from Silicon Valley Bank to Bridge Bank.  On March 16, however, the FDIC unexpectedly and unlawfully cut off SVBFG's access to approximately $1.93 billion of SVBFG's remaining funds at Bridge Bank. Because Bridge Bank, like Silicon Valley Bank, is headquartered in the County of Santa Clara, and SVBFG in this action seeks to restore approximately $1.93 billion of its funds at Bridge Bank, a substantial part of the property that is the subject of

1　the action is situated in the County of Santa Clara.  This action therefore arises in

2　the County of Santa Clara and "shall be assigned to the San Jose Division."

3　　　　　　　　　　　　　　　　　**PARTIES**

4　　　　　　28.　　SVBFG is a Delaware corporation having its principal place of

5　business at 387 Park Avenue South, New York, New York 10016.  Prior to the

6　events that led to the seizure of Silicon Valley Bank on March 10, 2023, SVBFG

7　was a bank holding company and the ultimate corporate parent of Silicon Valley

8　Bank, which was headquartered in Santa Clara, California.  SVBFG filed a petition

9　for relief under Chapter 11 of the Bankruptcy Code on March 17, 2023, and is

10　operating its businesses and managing its properties as debtor in possession

11　pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12　　　　　　29.　　The FDIC is an agency of the United States government charged by

13　law with, among other duties, administering the Federal Deposit Insurance Act and

14　the federal bank deposit insurance system.  SVBFG sues the FDIC in the instant

15　proceeding in its corporate capacity as the agency charged with carrying out the

16　Treasury Secretary's invocation of the systemic risk exception and administrator of

17　the Deposit Insurance Fund.

18　　　　　　　　　　　　　　　　**BACKGROUND**

19　　**I.**　　**Closure of Silicon Valley Bank and Appointment of the FDIC as**
20　　　　　　**Receiver**

21　　　　　　30.　　From 2000 until March 2023, SVBFG owned Silicon Valley Bank

22　and a number of other affiliated businesses, including an investment bank and a

23　private wealth management business.  SVBFG deposited substantially all its funds

24　with Silicon Valley Bank.

25　　　　　　31.　　As of March 10, 2023, SVBFG had approximately $2.1 billion in

26　three different deposit accounts maintained at Silicon Valley Bank.  SVBFG had

27　full and undisputed title to, and ownership of, these deposits prior to on or about

28　March 10, 2023.  This fact is uncontested.

32.     On March 10, 2023 (the "Closure Date"), the DFPI issued an order taking possession of Silicon Valley Bank.  On the same day, DFPI appointed the FDIC-R1 to serve as receiver for Silicon Valley Bank.

33.     Typically, when a bank is closed, the FDIC pays insurance to depositors up to the insurance limit of $250,000 within a few days after the bank closure, by either making the funds available through an account at another insured bank or by issuing a check to the depositor.  (Ex. 1 (Deposit Insurance FAQs).)  The FDIC acting as receiver for the closed bank then resolves the assets of the closed bank, including resolving claims for uninsured deposits.  (*Id.*)  Depositors with uninsured funds "may recover some portion of their uninsured funds from the proceeds from the sale of failed bank assets," but "it can take several years to sell off the assets of a failed bank.  As assets are sold, depositors who had uninsured funds usually receive periodic payments (on a pro-rata 'cents on the dollar' basis)."  (*Id.*)  Payments on claims for uninsured deposits, or other obligations of the failed institution, are designated by the FDIC as dividends.  (Ex. 2 (FDIC, Dividends from Failed Banks).)  According to the FDIC, "[c]ustomers with uninsured deposits are sometimes issued advance dividends based on the estimated recovery value of the failed institution's assets."  (Ex. 3 (FDIC Resolutions Handbook) at 28.)[1]

34.     On March 10, 2023, the day that Silicon Valley Bank was closed, the FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all insured deposits of Silicon Valley Bank to the DINB.  The FDIC then announced that:

---

[1]     The FDIC's "Resolution of Failed Institutions" further explains that, in general, only insured depositors are fully reimbursed under a least-cost resolution and noting that in "rare cases" the least-cost requirement "may result in the reimbursement or protection of uninsured depositors."  (Ex. 4 (FDIC, Resolution of Failed Institutions) at 6 n.8.)

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023. The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

(Ex. 5 (Press Release, FDIC, FDIC Creates a Deposit Insurance National Bank of Santa Clara to Protect Insured Depositors of Silicon Valley Bank).) Consistent with this announcement, on March 10, 2023, the Board of Directors of the FDIC issued a Resolution authorizing the Director of Complex Institution Supervision & Resolution (or her designee) to credit depositors' accounts with an estimated insurance deposit paid by the Deposit Insurance Fund and to approve the payment by the FDIC-R1 of an advance dividend.

## II. The Systemic Risk Exception

35. Under the Federal Deposit Insurance Corporation Improvement Act of 1991, the FDIC is generally required to resolve failed banks by using the method that would be least costly to the Deposit Insurance Fund. Thus, the foregoing payment and dividend plan for insured versus uninsured deposits was a lawful approach as of March 10, 2023; *i.e.*, for a bank failure in which a systemic risk exception has not been invoked and the normal failed bank resolution procedures apply.

36. Congress allowed one exception to this least-cost resolution requirement, however: Where the Secretary of the Treasury, acting upon the written recommendation of not less than two-thirds of the members of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System and after consulting with the President, determines that utilizing the least-cost

1   resolution method "would have serious adverse effects on economic conditions or
2   financial stability," and action or assistance under section 1823(c)(4)(G) "would
3   avoid or mitigate such adverse effect," the Treasury Secretary may invoke the
4   systemic risk exception to the least-cost resolution requirement.[2]  Any losses to the
5   Deposit Insurance Fund associated with the invocation of the systemic risk
6   exception are then required to be recovered through one or more special
7   assessments on insured depository institutions, depository institution holding
8   companies, or both.  12 U.S.C. § 1823(c)(4)(G)(i).  The Board of Directors of the
9   FDIC approved a final rule to implement exactly such a special assessment "to
10  recover the loss to the Deposit Insurance Fund (DIF) associated with protecting
11  uninsured depositors following the closure of Silicon Valley Bank and Signature
12  Bank" on November 16, 2023.

13      37.     Section 1823(c)(4)(G) does not define the specific form in which a
14  decision to invoke the systemic risk exception must occur.  Rather, the scope of the
15  exception is specifically defined by the Treasury Secretary's determination and
16  invocation, which follows recommendations from the Boards of the Federal
17  Reserve and the FDIC, and consultation with the President of the United States,
18  and includes both a determination that using the least cost resolution method would
19  "have serious adverse effects on economic conditions or financial stability" *and*
20  that the action or assistance "would avoid or mitigate such adverse effects."  12
21  U.S.C. §§ 1823(4)(G)(i)(I) and (II).  This is because the systemic risk exception is
22  intended to be used only in extraordinary instances where the determination of the
23  Nation's most senior regulatory officials, rather than the ordinary discretion of
24  administrators at the FDIC, is that such invocation is essential to government

25

26  _____

27  [2]  There may be a question whether the Treasury Secretary can pick and
    choose among uninsured depositors and, if so, what criteria, if any, would be
    applicable. But that question is irrelevant here where the Treasury Secretary
28  explicitly and deliberately chose to protect <u>all</u> uninsured deposits.

1   policy and process given the severity of the situation.  As the sponsor of the

2   Federal Deposit Insurance Corporation Improvement Act explained,

3               [The] bill makes the situation in the United States more

4               nearly parallel to that in other countries. It leaves the

5               Federal Reserve Board with its current authority to take

6               appropriate action to prevent a collapse of the financial

7               system.  But it takes such discretion away from the FDIC.

8               The bill would refocus the FDIC on the narrower task of

9               administering and protecting the deposit insurance fund.

10             137 Cong. Rec. 4936 (1991) (statement of Sen. Donald

11             Riegle, Jr.)

12      38.    Prior to March 2023 and unrelated to Silicon Valley Bank, the FDIC

13   and Federal Reserve recommended five potential emergency actions that would

14   require a systemic risk determination and invocation to permit the actions to be

15   taken.  The Treasury Secretary invoked the systemic risk exception with respect to

16   three of those five recommended actions, each time, in specifically proscribed

17   ways.  In the first instance, the exception was invoked to partially guarantee

18   $312 billion of Wachovia Corporation's ("Wachovia") assets in connection with a

19   potential acquisition of Wachovia by Citigroup, Inc. ("Citigroup").  When

20   Wachovia was subsequently purchased by a different banking organization, Wells

21   Fargo & Company, the FDIC assistance that was contemplated pursuant to the

22   systemic risk exception was no longer applicable, and the FDIC was limited to its

23   express statutory authority.  In the second instance, the exception was invoked to

24   authorize the establishment of the Temporary Liquidity Guarantee Program, a

25   market-wide program to guarantee certain debt issued by banks and to guarantee in

26   full non-interest-bearing deposit accounts held at participating banks and thrifts.  In

27

28

COMPLAINT

the third instance, the exception was invoked to provide a partial asset guarantee for $306 billion of Citigroup's assets.[3]

### III. The Treasury Secretary Invokes the Systemic Risk Exception to Guarantee All Uninsured Deposits at Silicon Valley Bank.

39. The March 10, 2023 announcement that the FDIC would pay uninsured Silicon Valley Bank depositors an advance dividend did not calm the market as was intended. As the FDIC itself explained, "[t]he announcement that the uninsured depositors of Silicon Valley Bank had not been fully protected reverberated through the financial markets on Friday and into the weekend and precipitated the failure of Signature Bank [a second bank unaffiliated with Silicon Valley Bank] . . . . Following these developments, the bank regulatory agencies had significant concerns that uninsured depositors would withdraw funds rapidly from other banks."

40. Over the weekend of March 11, 2023, the Department of the Treasury, the FDIC, and the Federal Reserve assessed the impact of the closures of Silicon Valley Bank and Signature Bank on the American banking system and financial markets. According to the Government Accountability Office's ("GAO") statutorily required review of the invocation of the systemic risk exception ("GAO Report"), the FDIC and the Federal Reserve "found that a least-cost resolution of SVB and Signature Bank would intensify deposit runs and liquidity pressures on other U.S. banks," and that "the failure of the two banks would lead to even greater dislocations in deposit markets." (Ex. 6 (GAO Report) at 29.) The FDIC and the Federal Reserve also reported observing broader economic effects of the closures,

---

[3] The two other potential emergency actions that were recommended by the Boards of the FDIC and Federal Reserve but did not result in a systemic risk invocation by the Secretary of the Treasury involved the potential provision of open bank assistance to Bank of America Corporation and the creation of a Legacy Loans Program under which the FDIC would provide certain guarantees on financing used by public-private investment funds to purchase troubled assets from financial institutions.

1   including the risk that among many uninsured depositors were corporate entities

2   that may not be able to make payroll or pay their suppliers. (*Id*. at 30.) The

3   Federal Reserve and the FDIC concluded "that preserving unimpaired access to all

4   uninsured deposits for SVB and Signature Bank would help mitigate adverse

5   impacts to financial stability and the economy." (*Id*.)

6       41.    Accordingly, on March 12, 2023, the FDIC-C, jointly with the Federal

7   Reserve, unanimously recommended to the Treasury Secretary that she invoke the

8   systemic risk exception to the least-cost resolution provision of the Federal Deposit

9   Insurance Act to protect the national banking system. The Treasury Secretary,

10  after consultation with the President of the United States, adopted the

11  recommendation and invoked the systemic risk exception under 12 U.S.C.

12  § 1823(c)(4)(G), to guarantee that all deposits at Silicon Valley Bank—insured and

13  uninsured—would be paid in full and that depositors would have immediate and

14  uninterrupted access to ***all*** of their funds.

15      42.    The Treasury Secretary could have chosen to have the FDIC-C

16  provide less than full protection of all depositors, but, on the recommendation of

17  the FDIC and Federal Reserve, did not do so. In fact, the GAO Report noted that

18  the Federal Reserve staff specifically analyzed extending only partial protection of

19  uninsured depositors, but the staff concluded that extending less than 100 percent

20  protection would be insufficient to calm the turmoil at the time, as "extending only

21  partial protection to uninsured depositors would have some beneficial effect, but

22  allowing material losses on these uninsured deposits still would result in significant

23  adverse effects in the financial markets." (*Id.* at 30-31.) In the face of this record,

24  the FDIC-C's current position that its administrators have the unbridled discretion

25  to decide which depositors to protect and in what amounts, is simply absurd.

26      43.    The determination to use the Deposit Insurance Fund to pay all

27  deposits of all Silicon Valley Bank depositors was a unilateral decision by the

28

United States Government that did not require any mutual undertaking by any of the former Silicon Valley Bank depositors (including SVBFG).

44.     As a result of the invocation of the systemic risk exception, SVBFG, like all other Silicon Valley Bank depositors, had an entitlement to continued access to all of its deposits, to be funded by the FDIC-C through the Deposit Insurance Fund to the extent necessary.

### IV.     The Systemic Risk Exception Invoked on March 12, 2023, Is Consistently and Correctly Described by the Treasury Secretary, the FDIC, and Other Banking Regulators as Applicable to All Silicon Valley Bank Depositors and Deposits.

45.     Over the ensuing days and months, the FDIC, Chairman Gruenberg, and numerous other senior government officials made public statements— including to the American public, Congress and the Bankruptcy Court— confirming that the systemic risk exception covered all uninsured deposits of all Silicon Valley Bank depositors.  These statements conclusively reflect the Secretary's and FDIC's state of mind and intention as to what the Secretary had authorized and directed in invoking the systemic risk exception.

46.     On March 13, 2023, the FDIC issued a press release titled "FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara, California."  The release states that "[t]he transfer of all the deposits was completed under the systemic risk exception approved yesterday.  All depositors of the institution will be made whole."[4]  (Ex. 7 (Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank).)  The transfer properly included all of SVBFG's deposits.

---

[4]     The release states that "[s]hareholders and certain unsecured debt holders will not be protected."  This statement merely indicated that neither shareholders nor unsecured debt holders would receive relief in those capacities.  Neither shareholders nor unsecured debt holders who separately maintained deposit accounts at Silicon Valley Bank were carved out—with respect to these deposits—from the terms of the Treasury Secretary's systemic risk exception invocation.

47. On March 16, 2023, in a statement before the Senate Committee on Finance, Treasury Secretary Yellen stated that "we worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks. On Monday morning, customers were able to access all of the money in their deposit accounts so they could make payroll and pay the bills." On Monday, March 13, 2023, SVBFG was among the depositors able to access all of the money in its deposit accounts.

48. On March 20, 2023, in an objection to the Bankruptcy Court in relation to SVBFG's motion for entry of an order authorizing SVBFG to continue to use its cash management system (the "Cash Management Motion"), counsel for the FDIC-R1 stated: "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid *in full* through the Deposit Insurance Fund." (*See In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y.) ("Ch. 11 Case") Dkt. No. 33 at ¶ 16 (emphasis added).)

49. On March 21, 2023, counsel for the FDIC-R1 repeated this in a hearing before the Bankruptcy Court on the aforementioned objection, asserting that "there was not a specific carve out in the [March 13, 2023] press release for [SVBFG's] deposits . . . . [T]o the extent [SVBFG's] claim is allowed and is not subject to set off or has been reduced by amounts that may be entitled to set off, that claim would be paid by the deposit insurance fund. And that deposit insurance fund is backed by the full faith and credit of the United States." (Ch. 11 Case Mar. 21, 2023 Hr'g Tr. at 56:22-57:21.) When the U.S. Trustee, a federal bankruptcy watchdog, stated the U.S. Trustee would only be comfortable with the Bankruptcy Court granting the Cash Management Motion if "any claims relating to the deposits . . . are guaranteed by the FDIC through the full faith and credit of the United States" (*id*. at 85:14-17), counsel for the FDIC assured the Bankruptcy Court that "to the extent [SVBFG's] deposit claim is determined to be valid, to the extent not subject to setoff, it will be paid by what's call the DIF, the Deposit

1  [Insurance] Fund, which is backed by the full faith and credit of the United States."
2  (*Id*. at 86:21-25.)

3       50.    On March 22, 2023, in testimony before the Senate Subcommittee on
4  Financial Services and General Government Appropriations, Secretary Yellen
5  stated, "[w]e took actions to protect all depositors at the two failed institutions and
6  provide additional liquidity for banks."

7       51.    On March 23, 2023, in a statement before the House Subcommittee on
8  Financial Services and General Government Appropriations, Secretary Yellen
9  stated, "[t]wo weeks ago, we learned of problems at two banks that could have had
10  significant impacts on the broader banking system and the American economy.  In
11  the days that followed, Treasury worked with the Federal Reserve and the FDIC to
12  take decisive and forceful actions to strengthen public confidence in the U.S.
13  banking system.  We took actions to protect all depositors at the two failed
14  institutions and provide additional liquidity for banks.  This was designed to
15  mitigate risks to the banking system."

16       52.    On March 28, 2023, in a statement before the Senate Committee on
17  Banking, Housing, and Urban Affairs, FDIC Chairman Martin J. Gruenberg stated,
18  "[a]fter careful analysis and deliberation, the Boards of the FDIC and the Federal
19  Reserve voted unanimously to recommend, and the Treasury Secretary, in
20  consultation with the President determined, that the FDIC could use emergency
21  systemic risk authorities under the Federal Deposit Insurance Act (FDI Act) to
22  fully protect all depositors in winding down SVB and Signature Bank."

23       53.    On the same day, in a statement before the Senate Committee on
24  Banking, Housing, and Urban Affairs, Federal Reserve Vice Chair for Supervision
25  Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury
26  Department and the Federal Deposit Insurance Corporation (FDIC), took decisive
27  actions . . . [that] demonstrate that we are committed to ensuring that all deposits
28  are safe."

54.     On March 29, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated, "[m]y testimony today will describe the events leading up to the failure of SVB and Signature Bank and the facts and circumstances that prompted the decision to utilize the authority in the FDI Act to protect all depositors in those banks following these failures."

55.     On May 11, 2023, Acting Comptroller of the Currency and FDIC Director Michael J. Hsu stated at an FDIC board meeting, "[i]n March, the U.S. government invoked the systemic risk exception to the least cost resolution requirement for failing banks.  The purpose was to protect all depositors, including uninsured depositors, following the failures of Silicon Valley Bank (SVB) and Signature Bank."

56.     On May 16, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated that "[f]ollowing the decision to fully protect all depositors in the resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the publicly traded banks that were experiencing large outflows in the immediate aftermath of those failures."

57.     On May 18, 2023, FDIC Chairman Gruenberg again referred to "the decision to fully protect all depositors in the resolution of both SVB and Signature Bank" in a statement before the Senate Committee on Banking, Housing, and Urban Affairs.

58.     On December 5, 2023, during a meeting of the FDIC's Systemic Resolution Advisory Committee, Ryan Tetrick, FDIC Deputy Director for Resolution Readiness, stated that the systemic risk exception "allowed us to protect all depositors of the failed banks, transfer those to fully operational bridge banks, and provide some . . . assurance to the system broadly."

59.     On the same day, at the same event, FDIC Chairman Gruenberg acknowledged that had the FDIC elected to pay an advance dividend rather than

1  recommending that the Treasury Secretary invoke the systemic risk exception to

2  protect all uninsured deposits, "depositors could get back 90 percent or maybe

3  more of their deposits," but "the judgment was, at the time, that anything less than

4  100 percent really had the potential to perpetuate and exacerbate the contagion

5  effect."

6        60.    Also during the December 5, 2023 Systemic Risk Resolution

7  Advisory Committee meeting, Tim Mayopoulos—who served as the Chief

8  Executive Officer of Bridge Bank and oversaw operations of Bridge Bank

9  beginning on March 13, 2023, when all of SVBFG's Account Funds were

10  transferred to Bridge Bank and made available to SVBFG—described the

11  invocation of the systemic risk exception as "the government's decision to protect

12  all the deposits at Silicon Valley Bank, regardless of the nature or size of those

13  deposits."

14        61.    The statutorily required GAO Report, which was based on documents

15  and interviews with FDIC, Federal Reserve and Treasury staff, repeatedly

16  reiterated, no fewer than eight times, that the systemic risk invocation guaranteed

17  all uninsured deposits of all depositors of Silicon Valley Bank.

18        62.    In summary, on numerous occasions and in numerous venues—

19  including sworn Congressional testimony and statements to the Bankruptcy

20  Court—the three responsible agencies consistently affirmed that all deposits of all

21  depositors were covered by the systemic risk exception.  In marked contrast, not

22  until the FDIC sought to divest SVBFG of its Account Funds did the FDIC

23  maintain that "all" could mean "less than all."

24

25  **V.     The FDIC Unlawfully Blocks SVBFG's Access to Its Account Funds Despite Repeatedly Acknowledging That All Uninsured Deposits Would Be Paid and Depositors Would Have "Full Access" to Their Money.**

26

27        63.    The same day that the Secretary of the Treasury authorized the

28  invocation of the systemic risk exception, the FDIC filed an application with the

1  Office of the Comptroller of the Currency (the "OCC") to establish Bridge Bank,

2  and the OCC approved the application.

3       64.    Although between March 10 and March 12, 2023, it was contemplated

4  that Silicon Valley Bank depositors would receive an immediate advance dividend

5  and a receivership certificate for their uninsured deposits, following and as a result

6  of the invocation of the systemic risk exception, the FDIC neither provided such an

7  advance dividend nor sent a receivership certificate to SVBFG or to any other

8  depositor with uninsured account funds.  Instead, the FDIC rescinded the

9  agreement transferring insured deposits to the DINB, caused the FDIC-R1 to

10  transfer all deposits at Silicon Valley Bank—insured and uninsured, alike—to

11  Bridge Bank, provided, or provided access to, funds from the Deposit Insurance

12  Fund to satisfy all deposit liabilities, and depositors of Silicon Valley Bank,

13  including SVBFG, automatically became customers of Bridge Bank, which was

14  not itself in receivership at that time.

15       65.    On March 13, 2023, the FDIC published its own independent press

16  release stating that its March 12, 2023 transfer of "all deposits—both insured and

17  uninsured—and substantially all assets of" Silicon Valley Bank to Bridge Bank

18  was "an action designed to protect all depositors of Silicon Valley Bank," and

19  "[d]epositors will have full access to their money beginning this morning, when

20  Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal

21  banking hours and activities."  (Ex. 7.)

22       66.    Moreover, when Bridge Bank opened on March 13, 2023, it

23  announced that depositors had "full access to their money," and that all existing

24  and new deposits were protected by the FDIC.  The FDIC reiterated this point in its

25  FAQs posted to its website on March 13, 2023:

26                 IS MY MONEY SAFE?  **Yes!**  No one lost any money on

27                 deposit as a result of the closure of this bank.  All deposits,

28

regardless of dollar amount, were transferred to Silicon

Valley Bank, N.A. [*i.e.*, Bridge Bank].

(Ex. 8 (FDIC Bridge Bank FAQs).)

67.     The transfer of "all deposits" to the newly created, FDIC-operated Bridge Bank included the transfer of all SVBFG's Account Funds.  Thus, pursuant to the systemic risk determination, SVBFG was treated like all other depositors of Silicon Valley Bank, and it was provided with access to all its deposits on March 13, 2023, as the Secretary of the Treasury determined and multiple senior government officials, including FDIC Chairman Gruenberg, represented and testified would be the case for all depositors.

68.     At that time, SVBFG's Account Funds were maintained in three accounts that are identified in the table set forth in ¶ 74 *infra*.  Those accounts contained approximately $2,115,958,220 in bank deposits that had previously been held at Silicon Valley Bank and were subsequently transferred to Bridge Bank.

69.     Following the transfer of its deposits to Bridge Bank, SVBFG was able to access its accounts in the same manner as any former depositor of Silicon Valley Bank and as it had prior to the Closure Date.  On March 15 and 16, 2023, SVBFG successfully initiated eight wire transfers from SVBFG's Account Funds at Bridge Bank, withdrawing approximately $180 million, *i.e.*, monies well in excess of the $250,000 deposit insurance limit.

70.     However, without explanation or warning, on the evening of March 16, 2023, everything changed.  On March 16, Bridge Bank rejected wire transfers that were properly initiated, purportedly because the FDIC-R1 instructed Bridge Bank to place a hold on SVBFG's accounts at Bridge Bank and to restrict any of the Account Funds from being withdrawn.

71.     The FDIC-R1 also directed Bridge Bank to assign SVBFG's deposit accounts and all associated assets and liabilities to the FDIC-R1, and Bridge Bank

1  complied with the FDIC-R1's instruction, even though SVBFG's funds at Bridge

2  Bank did not belong to FDIC-R1.

3      72.    Upon information and belief, the actions of the FDIC-R1 were

4  undertaken with the knowledge of employees of the FDIC-C and could not have

5  been undertaken without their acquiescence. The actions of the FDIC-R1 were

6  unauthorized, including because the uninsured deposits that comprised the balance

7  of SVBFG's deposit accounts at Bridge Bank were not assets of the FDIC-R1 and

8  because the actions violated the terms of the systemic risk exception invoked by

9  the Treasury Secretary.

10      73.    The FDIC-C, as the entity responsible for obtaining a charter from the

11  OCC, commencing the operations of Bridge Bank, and ensuring the payment of all

12  uninsured deposits pursuant to the invocation of the systemic risk exception, is

13  responsible for permitting this unlawful denial of access to and/or unlawful taking

14  of SVBFG's Account Funds. Since then, the FDIC-C has continued unlawfully to

15  refuse to provide SVBFG with its Account Funds despite due demand.

16      74.    SVBFG's Account Funds at Bridge Bank totaled approximately

17  $1.93 billion as of March 16, 2023, when SVBFG's access to them was taken

18  away. Below is a schedule describing SVBFG's accounts and the Account Funds

19  that are at issue in this Complaint, as of March 16, 2023, and prior to amounts

20  being swept or moved from SVBFG's accounts by the FDIC-C or the FDIC-R1

21  acting with the express or tacit authorization of the FDIC-C.

| No. | Description | Account No.[5] | Balance |
|-----|-------------|----------------|---------|
| 1. | Operating Account | *5270 | $1,771,057,098 |
| 2. | Regulation W Account | *0822 | $143,593,718 |
| 3. | SVB Capital Operating Account | *6176 | $19,154,892.40 |

[5]    The last 4 digits of each Bank Account are listed.

75.     SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the early morning of March 17, 2023.  At that point, SVBFG obtained all rights of a debtor in possession, including its pre-petition rights to recover its deposits as a matter of state and federal law and the benefits and protections of the automatic stay granted by 11 U.S.C. § 362.

76.     On March 27, 2023, the OCC closed Bridge Bank, and the FDIC transferred substantially all Bridge Bank's assets to another bank, First-Citizens Bank & Trust Company ("First Citizens"), pursuant to a purchase and assumption agreement.[6]  Following this transfer, the FDIC mailed a letter to Bridge Bank depositors on or around April 3, 2023, informing them that "[a]ll deposits [at Silicon Valley Bank] were fully insured" by the FDIC-C, and that "the full amount of your deposit was transferred" to First Citizens.[7]

77.     Notwithstanding the Secretary of the Treasury's invocation of the systemic risk exception to provide all depositors of Silicon Valley Bank with immediate access to the full amount of their uninsured deposits, as of March 16, 2023, the FDIC-C took away SVBFG's access to its deposits, or authorized the FDIC-R1 and/or FDIC-R2 wrongly to do so, in contravention of the obligations imposed upon it by the Treasury Secretary's invocation.  Since March 16, 2023, the FDIC-C has continued to refuse to provide SVBFG with access to its remaining

---

[6] Following the transfer of substantially all Silicon Valley Bank's assets to First Citizens, Bridge Bank was closed by the OCC and the FDIC was appointed to act as the receiver for Bridge Bank ("FDIC-R2").  This was 11 days after SVBFG's Account Funds were taken away.

[7] The notice makes clear that there was no claims process for Silicon Valley Bank or Bridge Bank depositors.  The notice states that "[a]ll deposits were fully insured and transferred to FIRST-CITIZENS BANK & TRUST COMPANY, RALEIGH, NC," but "if you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at [First Citizens], you may request a review of the FDIC's determination in the United States District Court where the Failed Institution was located."

$1.93 billion in deposits, as it is required to do under the systemic risk exception as invoked and determined by the Treasury Secretary.

78.     To the extent the FDIC-R1 and/or FDIC-R2 have blocked SVBFG's access to its Account Funds, the FDIC-C has impermissibly enabled them to do so, and their actions do not excuse the FDIC-C's obligation pursuant to the Treasury Secretary's determination to provide SVBFG with access to the full amount of its Account Funds.

79.     The FDIC-C's basis for denying SVBFG payment of the Account Funds is not a lack of available funds.  Indeed, the full amount of SVBFG's uninsured deposits at Silicon Valley Bank were made available to SVBFG at Bridge Bank before access to those funds was impeded for reasons having nothing to do with the FDIC-C's ability to fund them.  In any event, the FDIC-C's Deposit Insurance Fund has assets of approximately $119.3 billion held and available to pay the FDIC-C's deposit obligations.  Further, as promised, the FDIC-C funded the uninsured claims of depositors holding larger balances at Silicon Valley Bank than did SVBFG.

80.     Moreover, as a result of the invocation of the systemic risk exception, the FDIC-C is not only entitled to, but as a matter of law *must*, recover any loss to the Deposit Insurance Fund arising from such action through one or more special assessments on insured depository institutions.  12 U.S.C. § 1823(c)(4)(G)(ii).  The statutory framework provides that in those instances where a systemic risk exception is invoked, whether to protect uninsured deposits or otherwise, any resulting losses are recovered by assessing the insured depository institutions.

81.     In connection with this obligation, on or about approximately May 22, 2023, the FDIC-C issued a Notice of Proposed Rulemaking, seeking comment on a proposed rule that would impose special assessments to recover the loss to the Deposit Insurance Fund "arising from the protection of uninsured depositors in connection with the systemic risk determination announced on March 12, 2023,

following the closures of Silicon Valley Bank, Santa Clara, CA, and Signature Bank, New York, NY, as required by the Federal Deposit Insurance Act."  In connection with the proposed rulemaking, the FDIC again represented that all deposits previously held at Silicon Valley Bank—both insured and uninsured portions—were protected.

82.    On November 16, 2023, the Board of Directors of the FDIC approved a final rule to implement the special assessment "to recover the loss to the Deposit Insurance Fund (DIF) associated with protecting uninsured depositors following the closure of Silicon Valley Bank and Signature Bank."  Notably, in a November 16, 2023 memorandum from the FDIC Director of the Division of Insurance and Research to the FDIC Board of Directors, the FDIC again described the scope of the systemic risk exception as enabling "[t]he full protection of depositors, rather than imposing losses on uninsured depositors."

**VI.    SVBFG Commences the Adversary Proceeding Against the FDIC.**

83.    On June 26, 2023, SVBFG sent a letter to the FDIC-C demanding that the FDIC-C pay or give SVBFG full access to all its uninsured funds as required by the Treasury Secretary's invocation and determination of the systemic risk exception.  The demand was made pursuant to the invocation of the systemic risk exception—not 12 U.S.C. § 1821(f)—because it is a demand for uninsured deposits and section 1821(f) only applies to insured deposits, *i.e.*, deposits up to $250,000.  The FDIC-C did not respond to, or even acknowledge receipt of, SVBFG's demand until months after it was sent.  (Ex. 9 (June 26 Letter to FDIC).)

84.    On July 9, 2023, SVBFG filed the Adversary Proceeding in the Bankruptcy Court in connection with the bankruptcy proceeding, captioned *SVB Financial Group* v. *Federal Deposit Insurance Corp.*, *et al.*, No. 23-01137 (MG) (Bankr. S.D.N.Y.)  As to the FDIC-C, SVBFG asserts a turnover claim pursuant to 11 U.S.C. § 542 and Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeking to compel the FDIC-C to honor its legal obligation under the systemic risk

1 determination to repay SVBFG's deposits at Silicon Valley Bank from the Deposit

2 Insurance Fund. (Adv. Dkt. No. 1 ¶¶ 65-73.) SVBFG also asserts claims in the

3 alternative against the FDIC-R1 and the FDIC-R2. (*Id*. ¶¶ 74-79.) SVBFG also

4 asserts a claim against all three FDIC entities for violation of the automatic stay

5 under 11 U.S.C. § 362(a) for refusing to pay SVBFG the amount of the Account

6 Funds, and for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, seeking

7 a declaration that the FDIC-C has no right of setoff against the amount of the

8 Account Funds or, in the alternative, that any right of setoff is limited to amounts

9 for which there is mutuality of obligation between SVBFG and the FDIC-C or

10 between SVBFG and the FDIC-R1 or FDIC-R2. (*Id*. ¶¶ 80-81, 83-91.)

11        85.    The deadline for the FDIC, FDIC-R1 and FDIC-R2 to file proofs of

12 claim against SVBFG in the bankruptcy proceeding expired on September 14,

13 2023, and the FDIC-C filed no claims.[8] The FDIC-C's October 20 letter does not

14 identify any claims it has against SVBFG or identify any alleged right of setoff as a

15 basis to refuse to pay SVBFG the $1.93 billion in remaining Account Funds.

16 (Ex. 10 (FDIC, October 20 Denial).)

17        86.    All the claims asserted in the Adversary Proceeding were properly

18 brought before the Bankruptcy Court, which has subject matter and personal

19 jurisdiction. Sovereign immunity has been waived, and no administrative

20 exhaustion was required for the claims asserted. The turnover and automatic stay

21 claims are explicit rights under the Bankruptcy Code and are within the

22 Bankruptcy Court's core jurisdiction. Nevertheless, in as much as the FDIC-C

23 disputes the jurisdictional bases for the claims made in the Adversary Proceeding,

24 SVBFG re-asserts them here (along with additional claims based on the FDIC's

25

26

27 _____

28 [8]     The FDIC-R1 and FDIC-R2 also did not file proofs of claims against
     SVBFG in the bankruptcy proceeding.

October 20 letter) with a full reservation of rights as to its ability to proceed with the Adversary Proceeding.

87.    On August 11, 2023, all three FDIC entities filed Rule 12(b)(1) and 12(b)(6) motions in the Bankruptcy Court seeking to dismiss the adversary complaint.  For their jurisdictional argument, all three FDIC entities take the position that under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), no federal court has subject matter jurisdiction over any of the claims asserted as to any of the FDIC entities unless and until SVBFG exhausts the statutory FIRREA claims process applicable to depositors with claims against banks in receivership.  (*See* Adv. Dkt. No. 28 (FDIC-R1 Mot.) at 1-3; Adv. Dkt. No. 25 at 1-2 (FDIC-C Mot.) at 1-5; Adv. Dkt. No. 32 (FDIC-R2 Mot.) at 2-4.)  Likewise, the FDIC entities assert that even if the claims process had been exhausted, only the United States District Court for this District would have jurisdiction over claims against the FDIC-C, and only the District Court for this District or the District Court for the District of Columbia would have jurisdiction over claims against the FDIC-R1 or FDIC-R2 pursuant to FIRREA.  (*Id*.)  The FDIC entities also argue that under Rule 12(b)(6), in any event, SVBFG's turnover, automatic stay, and declaratory judgment claims should be dismissed because the claim amounts are "disputed."  (*Id*.)

88.    On the same day it filed its motion to dismiss, the FDIC-R1 filed a motion to withdraw the reference in the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).  (Adv. Dkt No. 30.)  That motion was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023.  (*SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218 (JPC) (S.D.N.Y.) ("S.D.N.Y. Dkt.") No. 1.)  On August 15, 2023, the FDIC-C and FDIC-R2 filed non-substantive joinders to the FDIC-R1's motion to withdraw the reference.  (*See* S.D.N.Y. Dkt. Nos. 3, 4.)

89.     On September 14, 2023, the Bankruptcy Court ordered that a hearing on all pending motions in the Adversary Proceeding was "adjourned sine die until such time after [the District Court] decides the [motion to withdraw the reference]."  (Adv. Dkt. No. 78.)  Thus, the motions to dismiss have not been addressed.

90.     On December 13, 2023, Judge Cronan granted the motion to withdraw the reference.

### VII. The FDIC-C Decides to Treat SVBFG's Demand for Payment of Uninsured Deposits as a Claim for Insured Deposits Under 12 U.S.C. § 1821(f) and Denies the "Claim."

91.     The FDIC has not promulgated any regulations concerning the submission of uninsured deposit claims, and the FDIC webpage providing "Failed Bank Information for Silicon Valley Bank, Santa Clara, CA" does not contain any information concerning the submission of an uninsured deposit claim against the FDIC-C.  Instead, the website only contains information concerning how to file a claim against the FDIC-R1 or FDIC-R2 "[i]f you or your company provided a service or product, leased space, furniture or equipment to SVB or Bridge Bank."  The official claims email address for the FDIC-R1 and FDIC-R2 claims process— NonDepClaimsDal@FDIC.gov—also makes clear that the claims process described therein does not apply to deposit claims.

92.     The FDIC-C also never sent SVBFG or any other Silicon Valley Bank or Bridge Bank depositor any documentation regarding the FDIC-C's supposed section 1821(f) claims process for uninsured funds formerly deposited at Silicon Valley Bank, including any information concerning any rules or procedures governing the section 1821(f) claims process or the standard by which the FDIC-C would make its determination.  And the FDIC-C did not offer SVBFG the opportunity to either submit any evidence or make oral or written submissions in support of its supposed section 1821(f) "claims," notwithstanding the fact that

SVBFG never submitted any evidence in support of its "claim" because its June 26, 2023 letter was never intended to be treated as a section 1821(f) claim.

93.     In response to discovery requests in the Adversary Proceeding seeking documents concerning the FDIC-C's supposed uninsured deposit claim process, the FDIC-C initially refused to produce any information concerning its supposed claims process.

94.     On September 14, 2024, SVBFG and the FDIC-C participated in a discovery conference in the Bankruptcy Court to discuss the FDIC-C's refusal to produce any information concerning its so-called section 1821(f) deposit claim process, or even to confirm or to deny whether any information about any such process even exists.  During the hearing, the Bankruptcy Court raised due process concerns after counsel for the FDIC-C confirmed that the FDIC-C had not promulgated any rules or regulations governing its claims process and had not provided SVBFG with any information whatsoever concerning its claims process. The Bankruptcy Court directed the FDIC-C to provide SVBFG with a statement, in writing, setting forth the applicable rules and procedures that applied to the FDIC-C's claims process.

95.     At the direction of the Bankruptcy Court, on September 19, 2023—almost three months after SVBFG sent its June 26, 2023 letter demanding access to or payment of its uninsured Account Funds—the FDIC-C sent SVBFG a letter, characterizing "[SVBFG's] June 26, 2023 letter as a timely claim for insurance coverage with respect to a deposit under 12 U.S.C. § 1821(f)" and stating that "the FDIC-C is working to provide [SVBFG] a final determination regarding insurance coverage within 30 days of the date of this letter."  (Adv. Dkt. No. 80-1 at 2.)

96.     Following the discovery conference with the Bankruptcy Court, the FDIC-C also agreed to produce documents in response to SVBFG's request that it produce documents describing the FDIC's claims process.  The FDIC-C, however, produced only a printout of 12 U.S.C. § 1821—again admitting that it has no

1   process.  In response to discovery seeking communications with SVBFG and with

2   other Silicon Valley Bank depositors reflecting instructions for submitting a

3   deposit claim, the FDIC-C produced only (i) its September 19, 2023 letter to

4   SVBFG acknowledging SVBFG's June 26, 2023 letter and purporting to

5   characterize SVBFG's demand for payment as a claim under section 1821(f), and

6   (ii) a notice to all depositors of Bridge Bank that Bridge Bank had been closed and

7   all Bridge Bank deposits transferred to First Citizens (which made no reference to

8   any supposed administrative claims process under section 1821(f)).

9       97.    On October 20, 2023, well in advance of any determination from

10  either the FDIC-R1 or FDIC-R2 regarding SVBFG's protective proofs of claims

11  for access to its Account Funds, the FDIC-C denied SVBFG's supposed "claim"

12  for its Account Funds.  The purported basis of the denial was twofold.  First, the

13  FDIC-C asserted that because SVBFG was able to withdraw more than $250,000

14  from its accounts at Bridge Bank between March 13 and March 15, 2023, the

15  "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide

16  SVBFG with access to its insured deposits."  (Ex. 10 at 9.)

17      98.    Second, ignoring the FDIC's own public proclamations, as well as

18  public statements and testimony to Congress by Secretary Yellen, Chairman

19  Gruenberg, and other senior government officials, the FDIC-C claimed that the

20  Treasury Secretary's invocation of the systemic risk exception did not obligate the

21  FDIC-C to follow any particular course of action, but rather authorized the FDIC-C

22  to exercise unfettered discretion in determining actions to take, including whether

23  to pay any uninsured deposit claims, whose claims to pay, and in what amounts,

24  notwithstanding the terms of the systemic risk exception (and the repeated public

25  announcements of the same) that *all* deposits and *all* depositors would be

26  protected.  The FDIC-C acknowledged that it treated SVBFG differently by

27  protecting uninsured deposits of other Silicon Valley Bank depositors, but it failed

28  to offer any explanation as to why SVBFG was afforded different treatment, or

1    why the Treasury Department, Federal Reserve Board, and FDIC announced to the

2    world that all uninsured deposits would be protected and senior government

3    officials reiterated this multiple times if that was not what was intended or required

4    by the Treasury Secretary's invocation of the systemic risk exception.

5    Section 1823(c)(4)(G) does not contemplate, and has never been used as, a

6    two-step process in which, first, the Secretary of the Treasury simply determines to

7    invoke the systemic risk exception and, second, the FDIC then determines how and

8    to what extent the invocation would be applied, a process that would subvert the

9    requirement that the decision be made at the highest level of the government.

10         99.    Under section 1821(f)(4), the FDIC-C's denial of SVBFG's claims is

11    "a final agency action reviewable in accordance with chapter 7 of title 5 by the

12    United States district court."  12 U.S.C. § 1821(f)(4).

13         100.   In order to seek relief from the FDIC-C's illegal withholding or taking

14    of SVBFG's Account Funds and to protect SVBFG's rights pursuant to

15    section 1821(f), assuming *arguendo* that such section applies at all to SVBFG's

16    "claim" against the FDIC-C, SVBFG commenced the present action.

17    **VIII.  The FDIC-C Fails to Provide SVBFG with Information**

18            **Concerning the Invocation of the Systemic Risk Exception.**

19         101.   As discussed above, the FDIC-C has taken the position in the

20    Bankruptcy Proceeding that the Treasury Secretary's invocation of the systemic

21    risk exception provides the FDIC-C with unfettered discretion to complete the

22    resolution of Silicon Valley Bank, including by ignoring the Treasury Secretary's

23    guarantee of all deposits of all depositors in order to block SVBFG's access to or

24    refuse to pay SVBFG's Account Funds.  Yet to date, the FDIC-C has failed to

25    produce documents describing the scope and terms of the Treasury Secretary's

26    systemic risk invocation in response to a Rule 2004 subpoena served in the

27    Bankruptcy Proceeding, requests for production of documents served in the

28    Adversary Proceeding, and a Freedom of Information Act request.

102. On June 29, 2023, SVBFG submitted a Freedom of Information Act ("FOIA") Request to the FDIC-C seeking records regarding the FDIC Board's decision to recommend the invocation of the systemic risk exception, including any documentation relating to the recommendation and the staff memorandum prepared by the Federal Reserve staff recommending the systemic risk exception.

103. On July 26, 2023, the FDIC-C sent SVBFG a letter acknowledging that FOIA "allows an agency twenty business days from its receipt of a request to make its determination," but noting that pursuant to 5 U.S.C. § 552(a)(6)(B), "in the case of unusual circumstances, the FOIA provides for an extension of the determination period by an additional ten days."

104. The FDIC-C failed to substantively respond to SVBFG's FOIA request within the time period required by 5 U.S.C. § 552, and in fact, has failed to respond to date, over five months after the request was sent.

## CLAIMS FOR RELIEF

### Count I
### Declaratory Judgment Under 28 U.S.C. § 2201 *et seq.*

105. SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

106. On March 12, 2023, the Secretary of the Treasury invoked the systemic risk exception to guarantee all insured and uninsured deposits of Silicon Valley Bank. Thereafter, the FDIC, Chairman Gruenberg, Secretary Yellen, and counsel for the FDIC-R1, as well as numerous other senior government officials, made statements to the American public, to Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation protected all deposits of all depositors of Silicon Valley Bank with the intention of avoiding a national banking crisis by convincing Silicon Valley Bank stakeholders, including depositors and others, that all deposits of all depositors were 100% safe at Bridge Bank. SVBFG

-37-

and SVBFG's stakeholders relied on those statements, as intended by the FDIC and others, and kept SVBFG's uninsured deposits at Bridge Bank.

107.    Notwithstanding the clear terms of the Treasury Secretary's invocation of the systemic risk exception as publicly described multiple times, including by the FDIC, the FDIC-C has refused to provide SVBFG with access to and/or has refused to pay to SVBFG the remainder of its uninsured Account Funds from the Deposit Insurance Fund.

108.    SVBFG is not required to submit or prove a claim under 12 U.S.C. § 1821(f) because the Account Funds are not insured funds under the terms of section 1821.

109.    Because the FDIC-C continues adversely to withhold access to or payment of SVBFG's Account Funds and to require SVBFG to prove a claim under section 1821(f), there is an actual controversy between the parties ripe for judicial resolution.

110.    SVBFG respectfully requests that the Court declare that (i) the uninsured Account Funds are not subject to section 1821(f); (ii) the FDIC-C has no right to, and is estopped from attempting to, ignore the Treasury Secretary's invocation and determination of the systemic risk exception to protect all uninsured deposits; and (iii) the FDIC-C must restore SVBFG's deposit accounts, including all interest earned on the Account Funds since the date the Account Funds were blocked or taken.

**Count II**
**Turnover of the Account Funds Pursuant to Section 542**
**of the Bankruptcy Code Against the FDIC-C**

111.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

112.    The Account Funds constitute property of SVBFG's estate under section 541(a) of the Bankruptcy Code.

113.   Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ."

114.   The Secretary of the Treasury, based on the recommendation of the FDIC-C and the Federal Reserve, invoked the systemic risk exception to guarantee all deposits, insured and uninsured, at Silicon Valley Bank and provided for "full access" to those funds.  This includes the SVBFG's approximately $2.1 billion in uninsured deposits that existed at the time of the Secretary of the Treasury's action, and the approximately $1,933,555,708.13 in uninsured Account Funds that remained when SVBFG's access to its Account Funds, then held at Bridge Bank, was taken away on or about March 16, 2023.

115.   The FDIC-C has unlawfully taken away SVBFG's Account Funds and/or authorized the FDIC-R1 and/or FDIC-R2 to do so.

116.   The FDIC-C continues unlawfully to refuse to provide SVBFG access to or payment of its Account Funds.

117.   On October 20, 2023, in response to SVBFG's June 26, 2023 letter demanding that the FDIC-C restore SVBFG's access to, or pay to SVBFG, the Account Funds, the FDIC-C confirmed in writing that it was refusing to pay SVBFG its Account Funds.

118.   The Account Funds constitute a debt the FDIC-C owes to SVBFG's estate, which is property of the estate and is matured, payable on demand, or payable on order.

119.   SVBFG's Account Funds are therefore subject to turnover pursuant to section 542 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

120.   Pursuant to section 542 of the Bankruptcy Code, FDIC-C is required to immediately return to SVBFG its Account Funds, including all interest accrued on the Account Funds since the date the Account Funds were blocked or taken.

**Count III**
**Violation of the Automatic Stay Under Section 362(a)**
**of the Bankruptcy Code**

121.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

122.   The automatic stay of section 362 of the Bankruptcy Code came into effect automatically by statute immediately upon SVBFG's filing of its voluntary petition for relief under Chapter 11, and the FDIC-C received notice of the automatic stay in this case.

123.   By refusing to release any of the Account Funds to SVBFG and/or to pay to SVBFG the amount of those Account Funds, the FDIC-C has violated, and continues to violate, the automatic stay applicable to SVBFG and its assets wherever located pursuant to section 362(a) of the Bankruptcy Code.

**Count IV**
**Violation of SVBFG's Fifth Amendment Due Process Rights**

124.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

125.   The Fifth Amendment's Due Process Clause protects against the government's deprivation of property without adequate due process.

126.   The FDIC-C refuses to provide SVBFG complete access to its Account Funds on the basis that the Treasury Secretary's invocation of the systemic risk exception "did not impose any legal obligation on [the] FDIC-C to pay SVBFG for its uninsured deposits or cause [the] FDIC-C to guarantee SVBFG's uninsured deposits."  (Ex. 10 at 9-11.)

127. However, the Treasury Secretary's invocation of the systemic risk exception to guarantee *all* deposits, insured and uninsured, of *all* depositors of Silicon Valley Bank, as jointly announced by the Treasury, FDIC, and Federal Reserve on March 12, 2023, created a property interest protected by due process.

128. SVBFG has a claim of entitlement to the Account Funds because the Treasury Secretary's invocation and determination unequivocally guaranteed all deposits of all depositors, including SVBFG and its uninsured deposits, would be paid by the Deposit Insurance Fund. Consequently, SVBFG's interest in its Account Funds is a property interest in a government benefit that the FDIC-C cannot unilaterally deprive SVBFG without adequate due process.

129. The FDIC-C has never provided a substantive rationale for treating SVBFG differently than other depositors by depriving SVBFG of access to or payment of its Account Funds, or by providing SVBFG with access to approximately $180 million of its account funds but not the remainder of the uninsured Account Funds.

130. The FDIC-C also has not afforded SVBFG *any* procedural due process with respect to its refusal to pay SVBFG its Account Funds. The FDIC-C never informed SVBFG that it—unlike all other depositors—would be required to do *anything* to have unobstructed access to its deposits, whether insured or uninsured. Nor did the FDIC-C inform SVBFG that it would not be able to access its deposits before SVBFG was blocked from accessing the Account Funds on or about March 16, 2023. Nor thereafter did the FDIC-C provide any explanation for why SVBFG's Account Funds were blocked, provide any sort of procedures or process for appealing that decision or for resolving SVBFG's demand to access its Account Funds, provide SVBFG any notice of the standards by which its demand would be evaluated, or offer SVBFG any opportunity to submit supporting evidence or arguments.

131.   As set forth above, it was only after SVBFG filed an adversary complaint against the FDIC-C *and* the Bankruptcy Court overseeing the Adversary Proceeding raised due process concerns with the FDIC-C's failure to implement any regulations or define, disclose, or follow any procedures with respect to its supposed section 1821(f) process that the FDIC-C informed SVBFG that it was treating its June 26, 2023 demand for payment as a timely deposit insurance claim.

132.   The FDIC-C cannot rely on its purported claims process under section 1821(f) as providing adequate due process for the denial of SVBFG's *uninsured* Account Funds because section 1821(f) only applies to claims for insured deposits.

133.   In addition, the FDIC-C's purported section 1821(f) claims process is inadequate because the FDIC-C never promulgated regulations governing a section 1821(f) claims process, especially for uninsured deposits (which are not covered by the statutory process for insured deposits), never informed SVBFG that it—unlike all other depositors—would be required to file a claim in its purported claims process, and never provided any instructions to SVBFG—or any other depositor—on how to submit a claim under section 1821(f) or the standards by which any such claim would be evaluated.

134.   SVBFG respectfully requests that the Court find that the FDIC-C's refusal to provide SVBFG with access to, or to pay SVBFG, its Account Funds is unlawful because it violated SVBFG's Fifth Amendment Due Process rights, and issue injunctive relief prohibiting the FDIC-C from continuing to deny SVBFG access to its Account Funds.

**Count V**
**The FDIC-C's Policy Exercising Discretion to Determine**
**Not to Pay or Provide Access to Uninsured Deposits Is Contrary to Law,**
**in Excess of Statutory Authority, and Arbitrary and Capricious**
**Under 5 U.S.C. §§ 702, 706(2)**

135.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.   The FDIC-C has adopted a purported policy pursuant to which it exercises discretion in determining which uninsured deposits of former Silicon Valley Bank depositors are guaranteed to be paid pursuant to the Treasury Secretary's determination and invocation of the systemic risk exception.

137.   The adoption of any such policy exceeds the FDIC-C's authority under the Treasury Secretary's invocation and determination of the systemic risk exception pursuant to 12 U.S.C. § 1823(c)(4)(G) and is arbitrary and capricious and contrary to law because the terms of the Treasury Secretary's systemic risk exception invocation with respect to Silicon Valley Bank do not afford the FDIC-C any discretion to determine whether or not to pay or provide access to any uninsured deposits of Silicon Valley Bank; rather, the terms of the systemic risk exception as invoked and determined by the Treasury Secretary require the FDIC-C to guarantee payment of all deposits of all depositors of Silicon Valley Bank, without exception.

138.   The FDIC-C's only discretion within section 1823(c)(4)(G), as applicable here, is in making a written recommendation to the Treasury Secretary on whether to invoke the systemic risk exception and how it should be implemented.  The FDIC-C did so here, when its Board of Directors, as well as the Federal Reserve Board, unanimously recommended that the Treasury Secretary invoke the systemic risk exception to the least-cost resolution framework, which recommendation the Treasury Secretary accepted to and protect all uninsured deposits of Silicon Valley Bank.

139.   Even if the Secretary could have left the FDIC the discretion to pick and choose among uninsured depositors, the Secretary clearly did not do so here. This is because depositors would not have retained their deposits at Bridge Bank and other regional banks at risk of failure had the FDIC-C been given such discretion.  Thus, the FDIC-C's discretion with respect to the systemic risk exception began and ended with its recommendation to the Treasury Secretary.

140.   Section 1823(c)(4)(F) provides that "[a]ny determination which the Corporation may make under this paragraph shall be made in the sole discretion of the Corporation."  By its terms, the section limits the FDIC-C's "sole discretion" to (i) determinations by the Corporation that are (ii) made under section 1823(c). Neither applies here, as the invocation of a systemic risk exception to pay all uninsured depositors of Silicon Valley Bank was made by Secretary Yellen, not the FDIC, *see* 12 U.S.C. § 1823(c)(4)(G) ("Emergency determination by [S]ecretary of the [T]reasury." ), and nothing in the section grants the FDIC-C discretion to refuse to comply with the Treasury Secretary's determination and invocation.

141.   Accordingly, the FDIC-C lacked the discretion to provide SVBFG with anything less than complete access to or full payment of SVBFG's Account Funds.

142.   The FDIC-C's policy is also arbitrary and capricious or otherwise unlawful within the meaning of the Administrative Procedures Act, 5 U.S.C. §§ 701-706, at 5 U.S.C. § 706(2).  The Treasury Secretary invoked the systemic risk exception to guarantee all insured and uninsured deposits of all depositors of Silicon Valley Bank following the determination by the Federal Reserve Board and the Board of the FDIC that issuing only a partial guarantee of deposits would not fully mitigate the potential adverse effects of the failure of Silicon Valley Bank and Signature Bank, and thus full protection of all deposits of all depositors was necessary to protect public confidence in the Nation's banking system.  Yet, the FDIC-C failed to provide an adequate reason for its decision to deviate from the

-44-

1    Treasury Secretary's determination (and in fact provided no reason at all at the

2    time the decision was made).

3        143.   Further, the terms of the systemic risk exception adopted by the

4    Secretary of the Treasury and announced jointly by the Treasury Secretary, Federal

5    Reserve Board, and the FDIC were intended to, and did, induce reliance by

6    uninsured depositors, like SVBFG, who otherwise would have withdrawn their

7    uninsured deposits from Bridge Bank and other banks if the FDIC-C was given any

8    discretion to decide whether to protect all uninsured deposits. Yet, the FDIC-C

9    failed to address whether there was any legitimate reliance on the terms of the

10   systemic risk exception adopted by the Secretary of Treasury and announced

11   jointly by the Treasury Secretary, Federal Reserve Board, and the FDIC.

12       144.   The FDIC-C's exercise of its purported discretion to refuse to return

13   SVBFG's uninsured deposits reflects the FDIC-C's final, considered position with

14   respect to the scope and terms of the statutory systemic risk exception invoked by

15   the Treasury Secretary, as evidenced by, among other things, the FDIC-C's briefs

16   submitted in support of its motion to dismiss SVBFG's adversary complaint and its

17   October 20 letter. This policy thus constitutes final administrative action under

18   5 U.S.C. § 704.

19       145.   SVBFG has been aggrieved by the FDIC-C's policy of exercising

20   discretion to determine whether to pay SVBFG's uninsured deposits because

21   SVBFG has been denied a benefit to which it is otherwise entitled under the terms

22   of the systemic risk exception as invoked and determined by the Secretary of the

23   Treasury, which did not afford the FDIC-C discretion to determine whether to

24   guarantee payment of, and if necessary, fund payment from the Deposit Insurance

25   Fund of, all uninsured deposits of all depositors of Silicon Valley Bank.

26       146.   The FDIC-C's denial of SVBFG's demand is also arbitrary and

27   capricious because the FDIC-C has no discretion to defy the Treasury Secretary's

28

invocation and determination of the systemic risk exception, which guaranteed all deposits at Silicon Valley Bank.

147.   Based on the foregoing violations, SVBFG requests a declaratory judgment that the FDIC-C lacks the authority to withhold access to or payment of SVBFG's uninsured deposits immediately, and is required to pay the Account Funds forthwith, as well as interest thereon, and recoup any amounts necessary to do so from the Deposit Insurance Fund.[9]

## Count VI
### Review of Final Agency Action Under 5 U.S.C. § 706

148.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

149.   SVBFG asserts this claim in the alternative, without prejudice to its position that section 1821(f) is not applicable, and the FDIC-C did not act pursuant to a legitimate section 1821(f) process.

150.   Pursuant to 12 U.S.C. § 1821(f)(4), "[a] final determination by the Corporation regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with" the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Under the Administrative Procedure Act, the reviewing court must set aside the FDIC-C's determination if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

151.   The Treasury Secretary's invocation of the systemic risk exception to protect all depositors and all deposits of Silicon Valley Bank vested SVBFG with a property interest in all its uninsured deposits, irrespective of the liquidation value

---

[9]   The interest payable on the Account Funds, which already amounts to about $80 million, could not be recouped by the FDIC from the special assessment, because this loss did not occur due to Silicon Valley Bank's failure, but was instead due to the FDIC-C's recalcitrance in failing to transfer the Account Funds to SVBFG.

1  of Silicon Valley Bank as of the date of the receivership or the level of value

2  derived from the receivership's monetization of Silicon Valley Bank's assets.

3      152.   The FDIC-C's denial of SVBFG's claims for its uninsured deposits

4  under the rubric of a purported section 1821(f) process for insured deposits was

5  arbitrary and capricious because the denial lacks due process and fair notice and is

6  contrary to the terms of the systemic risk exception approved by the Secretary of

7  the Treasury, which the FDIC-C has no discretion or authority to alter or ignore.

8      153.   The FDIC-C has not established any rules or procedures governing the

9  submission or adjudication of uninsured deposit claims for Silicon Valley Bank or

10 Bridge Bank depositors, including even the most basic guidelines governing the

11 resolution of a depositor's claim, such as (i) how a claimant may submit a valid

12 claim against the FDIC-C for insurance coverage, (ii) the deadline by which a

13 claimant must submit a valid claim against the FDIC-C for insurance coverage,

14 (iii) the standard under which a claim for insurance coverage is reviewed, (iv) what

15 evidence the FDIC-C may or may not consider in making its determination, or

16 (v) what rights a depositor has throughout the claims process.

17     154.   The FDIC-C initially provided SVBFG full access to its Account

18 Funds at Bridge Bank as required by the terms of the Treasury Secretary's

19 March 12, 2023 determination and invocation of the systemic risk exception, but

20 then blocked access to and/or took away SVBFG's Account Funds without notice

21 or explanation and in defiance of its obligations pursuant to the Secretary of the

22 Treasury's systemic risk determination.[10]

23     155.   The FDIC-C failed to notify SVBFG that, unlike every other depositor

24 of Silicon Valley Bank and contrary to public pronouncements and testimony by

25

26  _____

[10]    Had SVBFG known that the FDIC was going to unlawfully rescind its
27  promise to guarantee all deposits, SVBFG would have sought to transfer its
    accounts to another financial institution on March 13, along with many other
28  Silicon Valley Bank depositors who withdrew their uninsured funds when
    Bridge Bank opened on March 13, 2023.

the Secretary of the Treasury, Federal Reserve Board, and the FDIC-C, SVBFG would not be afforded full access to its Account Funds that had been transferred to Bridge Bank or that SVBFG's Account Funds at Bridge Bank were subject to seizure by the FDIC-C.

156. The FDIC-C failed to notify SVBFG that it would require SVBFG to submit a claim in its unidentified process to obtain its uninsured Account Funds, or information about when or how to do so.

157. The FDIC-C provided SVBFG with no information whatsoever concerning its supposed section 1821(f) claims process.

158. The FDIC-C did not give SVBFG an opportunity to submit evidence in support of its demand for access to, or payment of, its uninsured Account Funds.

159. In the absence of even a scintilla of fair notice or due process, the FDIC-C's denial of SVBFG's claims for access to or payment of the Account Funds is the epitome of arbitrary and capricious.

160. The FDIC-C continues to withhold payment from SVBFG, contravening federal law, the Treasury Secretary's statutory authority, its own recommendations and a myriad of public announcements by senior government officials, including the Chairman of the FDIC-C, that the Treasury Secretary's determination and invocation of the systemic risk exception protected all deposits of all depositors of Silicon Valley Bank. Consequently, the FDIC-C's denial of SVBFG's "deposit claim" must be set aside as arbitrary, capricious, and an abuse of discretion.

161. In light of the foregoing, SVBFG requests that this Court hold unlawful and set aside the FDIC-C's denial pursuant to 5 U.S.C. § 706, without affording any deference to the FDIC-C's whims.

## Count VII
### Estoppel

162. SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

163. The FDIC-C's March 10, 2023 announcement that uninsured depositors would receive an advance dividend within the next week and would receive a receivership certificate for the remaining amount of their uninsured funds did not sufficiently calm the markets and instead "precipitated the failure of Signature Bank."

164. On March 12, 2023, the Treasury Secretary invoked the systemic risk exception to directly address the imminent risk of a continued run on Nation's banking system by large corporate borrowers withdrawing significant amounts of uninsured deposits. The Treasury Secretary's invocation and determination of a systemic risk exception was announced in a joint statement with the FDIC and the Federal Reserve, which clearly and unambiguously stated that the Treasury Secretary's invocation of the systemic risk exception guaranteed that all deposits of all depositors of Silicon Valley Bank would be fully protected. The FDIC-C reiterated this in its own statement released on March 13, 2023, announcing that all deposits of the former Silicon Valley Bank had been transferred to Bridge Bank and that all depositors would have full and immediate access to the funds in their accounts beginning that morning.

165. The FDIC-C's promise was designed to prevent a bank run that could have affected public confidence in and the soundness of the Nation's banking system, and that might occur if depositors withdrew their funds out of a fear that they were at risk. Thus, the public statements assuring all depositors that their funds were safe and that all depositors would be fully protected were specifically designed to induce reliance by depositors, including SVBFG, to keep their funds at Bridge Bank. The FDIC-C not only intended that its public statements be relied

-49-

upon, but reasonably should have expected SVBFG and other depositors to rely on its guarantee to protect all of their uninsured Account Funds.

166.  In reliance on the announced guarantee of all deposits of all depositors of Silicon Valley Bank and Bridge Bank records which in fact showed that all of SVBFG's deposits were transferred to Bridge Bank on March 13, 2023, SVBFG did not attempt to withdraw or transfer all of its uninsured deposits out of Bridge Bank, even though it could have done so, as SVBFG had access to its funds for three days after the funds were transferred to Bridge Bank.

167.  In the months following the Treasury Secretary's invocation of the systemic risk exception on the FDIC-C's recommendation, among the recommendation of other government entities, FDIC-C representatives repeatedly confirmed that all deposits and all depositors were protected.

168.  If the FDIC-C's position is that it has complete discretion to determine whether to guarantee any uninsured deposits of former Silicon Valley Bank depositors and in what amounts, its statements on March 12 and 13 concerning the terms of the systemic risk exception and depositors' complete access the full amount of their deposit accounts, as well as numerous similar statements by Chairman Gruenberg, were knowingly and egregiously false.

169.  SVBFG has suffered damages from its reasonable reliance on the FDIC-C's public announcement that the Treasury Secretary's systemic risk invocation and determination protected all deposits of all Silicon Valley Bank depositors, which resulted in SVBFG being unable to access its approximately $1.93 billion in deposits when SVBFG's access to its Account Funds was blocked.

## Count VIII
### Failure to Produce Records Under the Freedom of Information Act

170.  SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

1    171.    SVBFG, through its FOIA request, properly asked for records within

2    the FDIC's control.

3    172.    The FDIC has neither produced any records to SVBFG in response to

4    its FOIA request, nor made any explicit and justified claims of statutory

5    exemption.

6    173.    SVBFG is not required to exhaust administrative remedies with

7    respect to the FDIC-C's wrongful withholding of the records requested in

8    SVBFG's June 29, 2023 FOIA request because the FDIC-C failed to timely

9    respond to the request.

10    174.    The FDIC-C violated the FOIA's mandate to release agency records

11    to the publics by failing to release the records SVBFG specifically requested.  5

12    U.S.C. §§ 552(a)(3)(A), (a)(4)(B).

13    175.    Accordingly, SVBFG is entitled to injunctive and declaratory relief

14    with respect to the release and disclosure of the records requested in SVBFG's

15    June 29, 2023 FOIA request.

16

17    ### **PRAYER FOR RELIEF**

18    NOW, THEREFORE, Plaintiff SVBFG prays for judgment and relief

19    against Defendant FDIC-C as follows:

20    a.    Judgment in SVBFG's favor and against Defendant FDIC-C on all

21    causes of action alleged herein;

22    b.    An order declaring that SVBFG owns the Account Funds and is

23    entitled to possession thereof;

24    c.    An order enjoining the FDIC-C and all affiliated entities acting in

25    concert with the FDIC-C from refusing to provide SVBFG with

26    access to the Account Funds;

27    d.    An order restoring SVBFG's Account Funds, together with all interim

28    earnings on those funds since SVBFG was deprived of access to them;

e.     An order directing the FDIC-C to pay and turn over to SVBFG the full amount of its Account Funds;

f.     An order declaring and holding unlawful the FDIC-C's policy permitting it to exercise discretion in carrying out the terms of the Treasury Secretary's systemic risk exception invocation and determination;

g.     An order declaring and holding unlawful and setting aside the FDIC-C's denial of SVBFG's "claims" for insurance coverage under 12 U.S.C. § 1821(f) and requiring the FDIC-C to pay to SVBFG the full amount of the Account Funds;

h.     An order declaring unlawful and enjoining the FDIC-C's ongoing violations of FOIA by failing to release its agency records to the public in response to SVBFG's lawful FOIA request;

i.     An order declaring SVBFG's claims to be valid and proven against the Deposit Insurance Fund;

j.     An award of pre- and post-judgment interest on the amounts of the Account Funds;

k.     An award of SVBFG costs and attorneys' fees as may be permitted by law; and

l.     An award to SVBFG of such other relief as may be just.

Dated:    December 19, 2023

/s/ Robert A. Sacks
Robert A. Sacks
Adam S. Paris
Diane L. McGimsey
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:   (310) 712-8800

Sverker K. Hogberg
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:  (650) 461-5600
Facsimile:   (650) 461-5700

*Attorneys for Plaintiff SVB Financial Group*